# District of Columbia
# Court of Appeals

**No. 15-CV-244**



FILED
MARCH 8, 2018
DISTRICT OF COLUMBIA
COURT OF APPEALS

KATAYOON BERESTON,

                                        Appellant,

    v.                                                      **CAB-416-14**

UHS OF DELAWARE, INC.
        and
DISTRICT HOSPITAL PARTNERS, LP,
d/b/a GEORGE WASHINGTON UNIVERSITY HOSPITAL,

                                        Appellees.


On Appeal from the Superior Court of the District of Columbia

Before GLICKMAN and MCLEESE, *Associate Judges*, and FERREN, *Senior Judge*.

## JUDGMENT

This case came to be heard on the transcript of record, the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgment on appeal is affirmed.

                            For the Court:

                            *Julio A. Castillo*

                            JULIO A. CASTILLO
                            Clerk of the Court

Dated: March 8, 2018.

Opinion by Associate Judge Stephen H. Glickman.

Concurring opinion by Senior Judge John M. Ferren.

Opinion by Associate Judge Roy McLeese, concurring in part and dissenting in part.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CV-244

KATAYOON BERESTON, APPELLANT,

v.

UHS OF DELAWARE, INC.
AND
DISTRICT HOSPITAL PARTNERS, LP,
D/B/A GEORGE WASHINGTON UNIVERSITY HOSPITAL, APPELLEES.

**03/08/2018**

FILED
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CAB-416-14)

(Hon. John M. Mott, Trial Judge)

(Argued December 10, 2015                    Decided March 8, 2018)

*Keith Lively*, with whom *Andre P. Barlow* was on the brief, for appellant.

*Alan S. Block*, with whom *Nadia A. Patel* was on the brief, for appellees.

Before GLICKMAN and MCLEESE, *Associate Judges*, and FERREN, *Senior Judge*.

Opinion for the court by *Associate Judge* GLICKMAN.

Concurring opinion by *Senior Judge* FERREN at page 43.

Opinion by *Associate Judge* MCLEESE, concurring in part and dissenting in part, at page 48.

GLICKMAN, *Associate Judge*:   Katayoon Bereston appeals the dismissal of her complaint under Superior Court Civil Rule 12 (b)(6) for failure to state a claim upon which relief can be granted.  At issue are two counts in which Ms. Bereston invoked the District of Columbia's judicially-created public policy exception to the doctrine of at-will employment.  In the first count, Ms. Bereston asserted that George Washington University Hospital ("the Hospital") wrongfully terminated her employment as its Director of Admissions due to her refusal to violate federal law.  In the second count, Ms. Bereston complained that she was subjected to harassment at the Hospital prior to her termination in retaliation for her insistence on strict compliance with federal health care laws and regulations.

Although an at-will employee who is discharged for refusing to violate the law (or for other reasons that transgress a clear mandate of public policy) may have a common-law cause of action for wrongful termination, we affirm the dismissal of Ms. Bereston's claims.  We hold that the first count of her complaint fails to plead facts sufficient to state a plausible claim that Ms. Bereston's refusal to break the law was the sole or predominant reason for her firing.  As to the second count, Ms. Bereston concedes that it does not state a cognizable claim under current law. Although this court has held that termination of employment in contravention of public policy may be actionable, we have not extended that holding to adverse

employment actions other than termination. Ms. Bereston urges us to expand the public-policy exception to the at-will employment doctrine so as to permit claims "where the employee has been harassed, retaliated against, and suffered other adverse employment actions short of termination for conduct in furtherance of public policy."[1] Even if this court might consider undertaking that task without legislative direction, however, this is not an appropriate case in which to do so, because Ms. Bereston's complaint fails to plead facts sufficient to state a plausible claim of actionable harassment or retaliation prior to her discharge.

**I.**

Before summarizing the allegations in Ms. Bereston's complaint, we set forth the standards under which we will evaluate their sufficiency. We review *de novo* a trial court's dismissal of a complaint for failure to state a claim upon which relief can be granted.[2] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

---

[1] Brief for Appellant at 20.

[2] *See Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 543 (D.C. 2011).

on its face.'"[3]  The "[f]actual allegations must be enough to raise a right to relief above the speculative level"[4]:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. . . .  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"[5]

"When there are well-pleaded factual allegations, a court should assume their veracity[,]"[6] but that tenet does not extend to "a legal conclusion couched as a factual allegation[.]"[7]  "Bare allegations of wrongdoing that 'are no more than conclusions are not entitled to the assumption of truth,' and are insufficient to

---

[3]  *Potomac Dev. Corp.*, 28 A.3d at 544 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[4]  *Twombly*, 550 U.S. at 555.

[5]  *Potomac Dev. Corp.*, 28 A.3d at 544 (quoting *Iqbal,* 556 U.S. at 678, and *Twombly,* 550 U.S. at 570).

[6]  *Id.* (quoting *Iqbal*, 556 U.S. at 679).

[7]  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

sustain a complaint."[8] In *Twombly*, for example, considering a complaint charging a violation of the antitrust laws, the Supreme Court held that the plaintiff's mere assertion that the defendants had entered into an unlawful agreement to prevent competition and inflate prices was a conclusory allegation not entitled to the benefit of the assumption of truthfulness.[9] Importantly, for present purposes, the Supreme Court made clear in *Iqbal* that allegations of motive, animus, purpose, knowledge, intent and the like are subject to the requirement that they must be supported by well-pleaded factual allegations in order to be accorded the presumption of veracity.[10] The same holds true for conclusory assertions of retaliation, intimidation, harassment, and other forms of hostility.[11]

---

[8] *Logan v. LaSalle Bank Nat'l Ass'n*, 80 A.3d 1014, 1019 (D.C. 2013) (quoting *Potomac Dev. Corp.*, 28 A.3d at 544, and *Iqbal*, 556 U.S. at 679).

[9] *Twombly*, 550 U.S. at 556-57.

[10] In *Iqbal*, the Court held that bare allegations that the Attorney General and the FBI Director agreed to, implemented, and condoned a discriminatory policy subjecting Arab Muslim men to arrest, detention, and harsh conditions of confinement solely on account of their religion, race, or national origin, and for no legitimate penological reason, were conclusory and did not deserve to be assumed true. 556 U.S. at 680-81. "It is true," the Court explained "that

> [Fed. R. Civ. Proc.] Rule 9 (b) requires particularity when pleading 'fraud or mistake,' while allowing '[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally.' But . . . . Rule 9 merely excuses a party from pleading discriminatory

*(continued…)*

## II.

Ms. Bereston's complaint presents the facts underlying her claims as follows.

The Hospital hired Ms. Bereston on October 3, 2011, to serve as its Director of Admissions.  Her duties in this position included "ensuring" that the Hospital

_____

*(…continued)*

> intent under an elevated pleading standard.  It does not give him license to evade the less rigid – though still operative – strictures of Rule 8. . . .  And Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss.

*Id.* at 686-87.

[11] *See, e.g.*, *Carter v. Verizon*, 2015 U.S. Dist. LEXIS 6370, *16 (S.D.N.Y. 2015) (holding plaintiff's "vague, conclusory allegations of 'intimidation' and 'hostile work environment'" to be "insufficient to survive a motion to dismiss"); *Petersen v. County of Stanislaus*, 2012 U.S. Dist. LEXIS 148874, *10-11 (E.D. Cal. 2012) ("Plaintiff alleges that Defendants' conduct constituted harassment 'in that it created a hostile work environment when plaintiff was subjected to differential treatment and was harassed; discriminated against; subjected to disparate treatment; defamed; retaliated against and suffered severe mental and emotional distress.'  This string of legal conclusions is wholly insufficient to allege a concerted pattern of behavior constituting harassment . . . ."); *cf. EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 253-54 (2d Cir. 2014) (holding that the *Twombly* and *Iqbal* requirement "that a complaint support the viability of its claims by pleading sufficient nonconclusory factual matter to set forth a claim that is plausible on its face" applies to employment discrimination claims).

complied with laws and regulations affecting its operations. On several occasions, as the complaint details and we shall describe, Ms. Bereston called attention to improper practices that could have exposed the Hospital to significant legal and financial liability. Her successful insistence on changing those practices allegedly alienated staff and physicians, and while her superiors agreed to the changes, they found fault with Ms. Bereston's rigorous performance of this aspect of her job. The discontent and hostility that Ms. Bereston encountered is the subject of the second count of her complaint (for retaliatory harassment). It also set the stage for the Hospital's ultimate decision to terminate Ms. Bereston's employment after a physician threatened to leave the Hospital because of her adamant refusal to satisfy a long-standing request for additional staffing – a refusal based on Ms. Bereston's belief that granting the request would jeopardize the privacy of patient health information in violation of the federal Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Ms. Bereston's termination is the subject of the first count of her complaint (for wrongful discharge).

Ms. Bereston's compliance-related difficulties at the Hospital allegedly began at the outset of her two-year tenure as Director of Admissions, in October 2011, when she found that Emergency Room patients were being asked how they would pay for treatment before they were screened by a triage nurse.

Understanding this practice to be in violation of the federal Emergency Medical Treatment and Active Labor Act ("EMTALA"),[12] Ms. Bereston "immediately" changed the process to comply with the law by moving admissions staff into the treatment area and implementing "bedside registration." In early 2013, Ms. Bereston persuaded the Hospital to stop admitting overflow medical and surgical patients into the acute rehabilitation unit in violation, as she understood, of regulations promulgated by the federal Centers for Medicare and Medicaid Services ("CMS"). In the summer of 2013, Ms. Bereston asserted that the so-called "Stark Law"[13] prohibited the Hospital's collection of copayments on behalf of physicians who referred Medicare and Medicaid patients to it. Although the affected physicians were displeased, the Hospital agreed to cease that practice. Throughout her tenure, moreover, Ms. Bereston was "vigilant in identifying situations where potential HIPAA violations could arise" and "made sure her staff and appropriate personnel were informed, updated regularly and trained on HIPAA law and regulations[.]"[14]

---

[12]  42 U.S.C. § 1395dd (h) (2011).

[13]  42 U.S.C. § 1395nn (2010).

[14]  The complaint alleges only one instance in which the Hospital did not correct a problem Ms. Bereston sought to have corrected. In July 2013, Ms. Bereston alleges, her reports that the Hospital pharmacy had billed patients who

*(continued…)*

Instead of receiving support and appreciation for her efforts, Ms. Bereston alleges that she encountered opposition and hostility. When Ms. Bereston reported the changes she had made to the Emergency Room admissions process to comply with EMTALA to Rick Davis, the Hospital's Chief Financial Officer and her supervisor at the time, he initially disagreed with them and thought them unnecessary. However, Mr. Davis "reluctantly agreed" to the changes after the Hospital's Director of Risk confirmed that Ms. Bereston was correct. Even so, unhappy members of the admitting staff, who "wanted to do things the way they had always been done," allegedly "called Ms. Bereston names, made remarks about her race, and were openly insubordinate"; one of them "screamed in her face" when she tried to explain the new procedures.

In March 2012, Mr. Davis convened a meeting of the Hospital's entire admissions staff. The meeting provided an opportunity for staff to "voice their frustration" with Ms. Bereston and her disruption of their work routine; she "was forced to listen to a long list of frivolous and petty complaints" from admissions staff who "condemned her for being mean and difficult to approach." After the

---

*(…continued)*
had not been treated there for prescription drugs "were given only lip service, marginalized, and then flatly ignored."

meeting, Mr. Davis took Ms. Bereston aside and "told her one-on-one that she needed to be more friendly and 'to ease up on the regulations.'"[15]

Ms. Bereston perceived that her subsequent efforts to bring the Hospital into compliance with federal laws and regulations were also unpopular; the complaint alleges in general terms that Ms. Bereston was treated with hostility and "bullied and ridiculed by both staff and her superiors[,]" but it provides few if any specifics to substantiate that she suffered such treatment or that her superiors opposed the changes she recommended. In addition to what has been quoted already in this opinion, the complaint states only that when Ms. Bereston advised Hospital officials of the "Stark Law" violation, "an associate administrator . . . ridiculed [her] for not spelling the name of the law correctly in an email," and Mr. Davis admonished her for spelling and grammar mistakes. Ms. Bereston also alleges that she "sought psychiatric care to cope with the intense hostility she faced on an almost daily basis" from the staff and the physicians who were discontented with

---

[15] Ms. Bereston interpreted this advice as a warning that "her insistence on legal compliance would be detrimental to her job security and the financial well-being of the Hospital." The complaint also alleges that the March staff meeting was held for the purpose of undermining Ms. Bereston's authority and ability to perform her job "in direct retaliation" for her identification and correction of deficient Hospital procedures. We view this latter allegation as conclusory, and we do not see that it is supported by well-pleaded factual allegations.

the new processes and procedures she instituted.

The complaint states that in 2013, Kimberly Russo, the Hospital's Chief Operating Officer, "accused" Ms. Bereston of lacking "influence leadership" and not being "a team player." Ms. Russo allegedly blamed Ms. Bereston for her staff's poor performance and high turnover rate (which Ms. Bereston acknowledges were problems), while physician and staff complaints about her "were always taken at face value and often handled unprofessionally by both Ms. Russo and [Hospital] human resources staff."[16] The complaint also alleges that "Ms. Russo and others continued systematic assaults on Ms. Bereston's authority by not supporting [her] efforts to earn the respect of and goodwill with the physicians and staff[,]" as when her requests for schedule changes and additional staff to "ease the burden on her overworked" Admissions Department employees were denied.

Ms. Bereston asserts that, by tolerating the discontent and hostility she allegedly endured and withholding their full support for her efforts, senior Hospital officials were "deliberately undermining [her] authority and diminishing her ability

---

[16] The complaint so states without providing any specific factual substantiation.

to perform her duties" because her efforts to "stop the Hospital from continuing to break the law" were (supposedly) having "a perceived and actual effect on [the Hospital's] immediate revenue stream." The complaint does not substantiate these conclusory allegations of wrongful motive, however; nor does it allege that Ms. Bereston's ability to perform her duties actually was impaired. On the contrary, Ms. Bereston alleges that "adherence to compliance was her job and responsibility, which she took seriously and performed well"; that she "fulfill[ed] her employment responsibilities with extreme care"; and that she again and again had "proven her value" to the Hospital by "performing her job" and correcting unlawful practices at the Hospital.

The incident that allegedly precipitated Ms. Bereston's termination arose not from a change that she initiated, but rather from a requested staffing change that she refused to make. The request came in the summer of 2012, when a physician, Dr. Rachel Brem, sought changes in the intake process at the Hospital's radiology clinic (which Dr. Brem managed) because patient registration was too slow. Dr. Brem requested that six admissions registrars be assigned to the clinic to handle the patient registration *in situ*. Ms. Bereston told her that because the registration area was small and insufficiently private, it would be "impossible" to install more than

three registrars without violating HIPAA and its privacy regulations.[17]  The issue was brought to the attention of Ms. Russo, and Ms. Bereston was instructed to "work with other [Hospital] staff on solutions to satisfy Dr. Brem's concerns without violating HIPAA."

In May 2013, when a solution had not been devised,[18]  Dr. Brem again complained and insisted that the number of admissions registrars in her clinic be increased from three to six.  By this time, other physicians also were complaining about registration delays and demanding more admissions personnel.  The physicians threatened to refer their patients elsewhere if the Hospital did not satisfy

---

[17]  The complaint does not clarify the basis for Ms. Bereston's judgment that it would have been impossible to avoid violating HIPAA if more than three registrars were placed in the radiology clinic registration area.  In describing HIPAA's requirement to maintain the privacy of individually identifiable patient health information, the complaint states only that "[f]or example, if a registration for one patient was taking place within earshot of other patients in a waiting room, or if patients waiting in line could see another patient's information on a computer screen, the hospital would be violating HIPAA and subject to fines and penalties." We discuss the insufficiency of Ms. Bereston's allegations of a violation of HIPAA in Section III.A.2, *infra*.

[18]  The complaint states that Ms. Bereston had completed her part of the project by "identify[ing] new processes to help Dr. Brem," but that another administrator, who had been tasked with redesigning the layout of the radiology clinic, "had done nothing."  The complaint does not indicate what "new processes" Ms. Bereston had proposed, to whom (if anyone) she communicated them, or how her ideas were received.

their concerns. The complaint does not explain why Ms. Bereston (or the Hospital) did not respond to the concerns of the physicians other than Dr. Brem; Ms. Bereston does not allege that HIPAA restrictions or other legal requirements prevented her from doing so.

On September 6, 2013, Ms. Russo met with Ms. Bereston and issued her a Performance Improvement Plan ("PIP"). The PIP gave Ms. Bereston ninety days to improve but also provided for a review after thirty days, at which time she could be terminated pursuant to the Hospital's progressive discipline policy. Ms. Bereston's complaint does not recite the PIP's contents except to say that it "accused" her of lacking qualities of "leadership" and "satisfaction" and mentioned "feedback from our corporate partner" as the reason for the discipline.[19] Although Ms. Bereston was not told what the "feedback" was, her complaint alleges that it "related to [her] insistence that [the Hospital] comply with various laws and regulations." The complaint contains no factual allegations supporting this assertion as to the nature of the "feedback." Nor do Ms. Bereston's factual

---

[19]    The complaint states that the "corporate partner" to which the PIP referred was presumably Medical Faculty Associates, Inc. ("MFA"), the large physician practice group with which Dr. Brem and other Hospital physicians were affiliated. According to the complaint, MFA "wields significant power within the Hospital" because it is "practically the sole source" of its patient referrals.

allegations support her complaint's conclusory assertion that the PIP "was not justified and was a classic employer attempt to create a pretext for termination."

According to the complaint, "[i]t was clear to Ms. Bereston that this PIP was issued by Ms. Russo to lay the groundwork to fire her at the next opportunity." Nonetheless, after thirty days, Ms. Bereston had not come up with a HIPAA-compliant solution to Dr. Brem's problem (and the complaint does not allege that Ms. Bereston made progress in any other area). On October 18, 2013, Dr. Brem confronted Ms. Bereston at the radiology clinic.[20] Angrily "accusing her of not knowing anything, not fixing anything, [and] not taking responsibility," Dr. Brem allegedly demanded six registrars for her clinic "or she would walk out of the Hospital, taking her practice and her patients with her." Ms. Bereston "reluctantly" proposed a compromise plan to provide "up to five" admissions personnel plus a "floating manager," although she privately believed this would be "stretching HIPAA to the absolute limit, and that the demands placed upon the floating manager would be untenable." Dr. Brem rejected this proposal and reiterated her demand for six registrars immediately or the Hospital "would start losing

---

[20] According to the complaint, Dr. Brem "ambush[ed]" her and was "screaming" at her so loudly that they were asked to move into Dr. Brem's office and close the door.

business." Ms. Bereston refused to provide six registrars. The following week, she was called to Ms. Russo's office and her employment was terminated.

Ms. Bereston was given no official explanation for her discharge. Her complaint asserts that the Hospital terminated her because of her refusal to break the law to satisfy Dr. Brem and other MFA physicians.[21] "Also part of the motivation to terminate Ms. Bereston," the complaint states, "was simple laziness and a refusal to confront physician and staff discontent" arising from her implementation of changes that "often came at the expense of convenience for the physicians and staff."[22]

---

[21] The complaint states that "[b]ecause of its almost total reliance on MFA for patient referrals and revenue, . . . [t]he Hospital would not tolerate an employee who considered [its] obligations under the law to be more important than an unlawful demand from an MFA physician." Ms. Bereston further alleges that "[t]he purpose of the PIP was clear and unambiguous: Ms. Bereston must acquiesce to the physicians' demands, and in this particular situation, to Dr. Brem's unlawful demands or lose her job." We view these assertions as too conclusory to merit the assumption of truth granted to well-pleaded factual allegations.

[22] "For instance," the complaint elaborates,

> the physicians and staff had to change the way they had
> "always" done things. They had to learn new processes
> and procedures designed to protect privacy concerns.
> [The Hospital] did not want to shoulder the responsibility
> of managing physician and staff discontent, and found it

*(continued…)*

## III.

### A. Wrongful Discharge

### 1. Ms. Bereston's Invocation of the *Adams-Carl* Exception to Employment at Will

Ms. Bereston was an at-will employee of the Hospital. "It has long been settled in the District of Columbia that an employer may discharge an at-will employee at any time and for any reason, or for no reason at all."[23] This court has recognized a designedly "narrow" exception to this common-law rule, under which an at-will employee may have a claim sounding in tort for wrongful discharge if the employer's "sole" (or at least "predominant") reason for terminating the employee was the employee's refusal to break the law[24] or was in some other respect contrary to a "clear mandate of public policy . . . ."[25]

---

*(…continued)*
> desirable to allow Ms. Bereston to take the blame and suffer the brunt of physicians' and staff's daily hostility.

Here, too, we view the complaint's allegations regarding the Hospital's motivations as conclusory.

[23] *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30 (D.C. 1991).

[24] *See id.* at 34 (holding that "there is a very narrow exception to the at-will doctrine under which a discharged at-will employee may sue his or her former employer for wrongful discharge when the sole reason for the discharge is the

*(continued…)*

In the first count of her complaint, Ms. Bereston invokes this *Adams-Carl* exception. She claims the Hospital fired her for refusing to increase the number of admissions registrars and patient intake stations in the radiology clinic from three to six, even though her reason for refusing to do so was that it would have increased the likelihood of unintentional disclosures of confidential patient health information in violation of HIPAA.[26] The complaint does not specify what HIPAA provisions would have been contravened, but Ms. Bereston asserts on

---

*(…continued)*
employee's refusal to violate the law, as expressed in a statute or municipal regulation.").

[25] *See Carl v. Children's Hosp.*, 702 A.2d 159, 164 (D.C. 1997) (en banc) (plurality opinion of Judge Terry) (explaining that an at-will employee claiming to have been fired against public policy must demonstrate both a "clear mandate" of public policy – a policy that has been "officially declared" by statute or otherwise – and "a close fit" between that declared policy and "the conduct at issue" in his or her termination); *id.* at 197-98 n.2 (concurring opinion of Judge Steadman) ("[T]he standard set forth by Judge Terry, which is endorsed by the four judges approving it and which is acquiesced in by Judge King and myself, can be said to be the effective holding of the en banc court on that issue."); *see also, e.g.*, *Davis v. Cmty. Alternatives of Wash., D.C., Inc.*, 74 A.3d 707, 710 (D.C. 2013) (plaintiff invoking public-policy exception to at-will employment doctrine "must show that her protected activity was the predominant cause of her termination"); *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 886 (D.C. 1998) (upholding dismissal of claim of wrongful termination in violation of public policy where "the plaintiff's own complaint reveals that she was not terminated solely, or even substantially, for engaging in conduct protected by such an exception").

[26] Although Count I of Ms. Bereston's complaint attributes her firing only to her refusal to violate HIPAA, the complaint elsewhere suggests that her other efforts to prevent the Hospital from violating the law also motivated the decision.

*(continued…)*

appeal that placing as many as six registrars in the clinic would have required her to violate 42 U.S.C. § 1320d-6 and a federal regulation, 42 C.F.R. § 164.530 (c), that was promulgated to implement HIPAA. The statute criminalizes the knowing disclosure of personal health information without authorization.[27] The regulation requires hospitals and other entities to have "appropriate . . . safeguards" and to

---

*(…continued)*

However, Ms. Bereston's briefs in this court describe her allegedly wrongful termination as based solely on her refusal to violate HIPAA by acceding to Dr. Brem's demand for six registrars, and not on any other legally protected conduct. Ms. Bereston has not argued that her wrongful-discharge claim should survive even if it is not adequately supported by the allegations concerning her refusal to violate HIPAA. Accordingly, we construe Count I to predicate her wrongful termination claim on this refusal.

[27] In pertinent part, 42 U.S.C. § 1320d-6 (a) reads as follows:

> Offense. A person who knowingly and in violation of this part [42 U.S.C. §§ 1320d *et seq.*] . . . (3) discloses individually identifiable health information to another person, shall be punished as provided in subsection (b). For purposes of the previous sentence, a person (including an employee or other individual) shall be considered to have . . . disclosed individually identifiable health information in violation of this part if the information is maintained by a covered entity (as defined in the HIPAA privacy regulation described in section 1180 (b)(3) [42 U.S.C. § 1320d-9 (b)(3)]) and the individual . . . disclosed such information without authorization.

"reasonably safeguard" the privacy of protected health information.[28] This Privacy Rule provision mirrors HIPAA's statutory requirement that covered entities "maintain reasonable and appropriate administrative, technical, and physical safeguards . . . to ensure the . . . confidentiality" of health information and "to

---

[28] At Congress's direction, *see* P.L. 104-191, Title II, Subtitle F, § 264, 110 Stat. 2033 (codified as a note to 42 U.S.C. § 1320d-2 (1996)), the Department of Health and Human Services ("HHS") developed recommended standards to implement the privacy of patient health information under HIPAA. HHS eventually promulgated them in final regulations, collectively called "Standards for Privacy of Individuals' Identifiable Health Information" or the "Privacy Rule," codified at 45 C.F.R. §§ 160 and 164 (2000). The provision on which Ms. Bereston relies, 42 C.F.R. § 164.530 (c), reads as follows:

> (1) Standard: Safeguards. A covered entity must have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information.
>
> (2)(i) Implementation specification: Safeguards. A covered entity must reasonably safeguard protected health information from any intentional or unintentional use or disclosure that is in violation of the standards, implementation specifications or other requirements of this subpart.
>
> (ii) A covered entity must reasonably safeguard protected health information to limit incidental uses or disclosures made pursuant to an otherwise permitted or required use or disclosure.

protect against any reasonably anticipated . . . unauthorized uses or disclosures of the information."[29]

We conclude that Ms. Bereston's complaint fails in two respects to present a plausible claim for relief from her discharge under the *Adams-Carl* exception to the at-will employment doctrine. First, the well-pleaded factual allegations of the complaint do not show that putting six registrars in the radiology clinic actually would have violated HIPAA by jeopardizing the confidentiality of patient health information. Second, the well-pleaded factual allegations of the complaint also are insufficient to support a plausible claim that the Hospital's sole or predominant reason for firing Ms. Bereston was her refusal to break the law, or that the Hospital's expressed reasons for putting her on a PIP were pretextual. In each of these two respects, we find that the complaint pleads facts that are at best "merely consistent with" the Hospital's alleged liability and so "stops short of the line between possibility and plausibility of 'entitlement to relief.'"[30]

---

[29] 42 U.S.C. § 1320d-2 (d)(2).

[30] *Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 544 (D.C. 2011) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).

### 2. Failure to Plausibly Allege a Violation of HIPAA

As to the first deficiency, in order to state a plausible claim for relief under the *Adams-Carl* exception, it is not enough for Ms. Bereston merely to *assert* that acceding to Dr. Brem's request for six registrars would have endangered the privacy of protected patient information in violation of HIPAA. That is only a conclusion of law. Nor is it enough for Ms. Bereston merely to allege that she acted as she did because she reasonably *believed* she was refusing to break the law. This court has never held that an employee's reasonable (but wrong) belief that what her employer required her to do was illegal is enough to support a wrongful-discharge claim under the *Adams-Carl* exception to employment at will. On the contrary, we have expressly declined to "alter our requirement for a remedy for wrongful discharge of an at-will employee to a lesser requirement that the employee have a reasonable belief that he or she is being wrongfully discharged."[31] As other courts have discerned, there is good reason for not extending the exception to employees who were fired for refusing to do what they incorrectly believed was unlawful. We agree with the following explanation by the United States Court of Appeals for the Third Circuit:

---

[31] *Rosella v. Long Rap, Inc.*, 121 A.3d 775, 779 (D.C. 2015).

The public policy exception to the doctrine of employment at-will does not exist . . . to protect the employee. Rather it is the protection of society from public harm, or the need to vindicate fundamental individual rights, that undergird[s] an at-will employee's common law action for wrongful discharge . . . .

The employee's good intentions are not enough to create a cause of action for wrongful discharge . . . . If an employee can avoid discipline whenever he reasonably believes his employer is acting unlawfully, it is the employee, not the public, who is protected by the good intentions. A company acting within the law is presumed to pose no threat to the public at large. The creation of a cause of action based on an employee's reasonable belief about the law would leave a private employer free to act only at the sufferance of its employees whenever reasonable men or women can differ about the meaning or application of a law governing the action the employer proposes. The effect such a rule might have on corporate governance and the efficient operation of private business organizations is not insignificant. . . . [W]e therefore conclude that a clear violation of public policy depends on an actual violation of law.[32]

---

[32] *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 331-32 (3d Cir. 1993) (predicting that the Pennsylvania Supreme Court would not recognize a cause of action for wrongful discharge based on an employee's reasonable belief that the act his employer required him to perform was unlawful, unless the act was in fact unlawful); *see also Holden v. Univ. Sys. of Md.*, 112 A.3d 1100, 1107 (Md. Ct. Spec. App. 2015) (affirming dismissal of wrongful discharge complaint for failure to state a claim, where it alleged that the employee was discharged for refusing to participate in activities she believed were prohibited by federal law, and the employee failed to demonstrate a violation of federal law).

Thus, to state a plausible wrongful discharge claim, Ms. Bereston's complaint must contain factual allegations that substantiate her conclusory assertions and beliefs regarding the illegality of granting Dr. Brem's request. Ms. Bereston's complaint lacks the necessary factual substantiation.

Absent are any factual allegations clarifying whether, how, or to what extent raising the number of registrars in the radiology clinic from three to six actually would have exposed patient health information to a heightened risk of unintentional disclosure. For example, the complaint does not describe the dimensions or layout of the radiology clinic's admissions area or the space allotted for the transmission and receipt of confidential patient information. It says nothing about the volume of patients the radiology clinic currently serves and how adding registrars would affect the number of persons present at any given time. It does not describe the nature and duration of the registration process or why it might subject protected patient information to increased exposure to bystanders. Assuming that Ms. Bereston's concern was with crowding in the admissions area, her complaint does not identify and describe that putative problem in any way. It says nothing about how close bystanders already were or would be to patients being admitted; whether their proximity already did or would permit them to overhear or glimpse confidential information; or how often such opportunities

already occurred or realistically might occur. Similarly, the complaint does not address the availability and efficacy of safeguards to avoid the inadvertent exposure of patient data, such as the placement of partitions between registrars and in positions to block computer screens and sensitive documents from public view.

In short, the complaint fails to explain in any factual way why the confidentiality of patient health information could be preserved in the radiology clinic admissions area with three registrars, and indeed with the five registrars plus a roving manager that Ms. Bereston counter-offered, but not with six registrars. It is not obvious that increasing the number of registrars to six would be likely to increase the risk of such unintentional disclosures or that measures could not be taken to minimize that risk.[33]

Moreover, even if there would have been a somewhat greater risk of unintentionally exposing confidential patient health information to bystanders, that does not necessarily mean adding registrars would have violated HIPAA. The Privacy Rule makes clear that HIPAA does not require covered entities to

---

[33] Adding registrars even might work to decrease the disclosure risk by reducing wait times and expediting the movement of patients out of the admissions area, thereby reducing the crowding and the number of bystanders present to whom information might be revealed inadvertently.

eliminate *all* avoidable risk of unintentional disclosures of confidential patient information. Rather, 42 C.F.R. § 164.530 (c) requires that "reasonable" and "appropriate" measures be taken to safeguard patient privacy.[34] This is a tacit acknowledgment that perfection is not achievable and that the goal of protecting the privacy of patient health information, while important, justifiably may be balanced against other constraints and imperatives, including the worthy goal (pursued by Dr. Brem in this case) of reducing the time patients must wait before they receive care. In the present case, if doubling the number of registrars from three to six would have cut registration delays substantially (perhaps in half) while only marginally elevating the risk that sensitive patient information would be exposed inadvertently to strangers in the waiting room, that would not seem to be an "unreasonable" or "inappropriate" change.

---

[34] See *supra* note 28. Our reading of 42 U.S.C. § 1320d-6 (a), the criminal provision prohibiting the knowing and unauthorized disclosure of personal health information in violation of HIPAA, is informed by this Privacy Rule provision. Thus, even if Ms. Bereston foresaw that Dr. Brem's request for additional registrars would increase the risk of unintentional disclosures of protected patient health information, we are not persuaded that Ms. Bereston would have violated § 1320d-6 (a) by acceding to the request. She has cited, and we are aware of, no case in which a criminal violation of HIPAA was predicated on an increased risk of unintentional disclosures.

Thus, the factual allegations in Ms. Bereston's complaint not only fail to show there would have been a greater risk of inadvertent disclosure of confidential patient health information had she acceded to Dr. Brem's request for three more registrars in the radiology clinic. They also fail to show that any heightening of the risk would have been consequential enough that it would have been forbidden by HIPAA or offensive to a "clear mandate" of the privacy policy declared by that legislation.[35]

### 3. Failure to Plausibly Allege an Improper Motive for Discharge

Turning to the second shortcoming of Ms. Bereston's claim of wrongful discharge, while it is true that her termination came on the heels of her blow-up with Dr. Brem, we perceive the factual allegations of the complaint to be insufficient to support a plausible assertion that the Hospital's sole or predominant reason for firing her was her refusal to violate HIPAA. First, the complaint does not allege that the Hospital ever ordered Ms. Bereston to violate HIPAA in order to

---

[35] For the same reasons, the complaint's factual allegations do not show the requisite "close fit" between the policy of HIPAA and Ms. Bereston's rejection of Dr. Brem's request for six registrars.

keep her job.[36] Nor does the complaint allege that the Hospital agreed with Ms. Bereston that it would contravene HIPAA to place as many as six registrars in the radiology clinic. On the contrary, the complaint actually alleges that the Hospital's Chief Operating Officer, Ms. Russo, instructed Ms. Bereston to "work with other [Hospital] staff on solutions to satisfy Dr. Brem's concerns *without violating HIPAA*." Nothing in the complaint indicates the Hospital would not have continued to seek a HIPAA-compliant resolution of the problem. Although the complaint conclusorily accuses the Hospital of not caring about its legal obligations when money was at stake, its factual allegations do not justify that accusation. In contrast, the complaint alleges that the Hospital administration had repeatedly agreed to the changes Ms. Bereston called for to comply with the law, even when those changes had dismayed staff or irritated physicians and were deemed to be costly. Evidently, therefore, while it may be inferred that Ms. Bereston's final clash with Dr. Brem contributed to the Hospital's decision to end

---

[36] *Cf. Rosella*, 121 A.3d at 779 (holding claim of wrongful discharge under *Adams-Carl* "deficient" because "[t]here is no showing that appellant, in this instance, was forced to choose between continuing his employment or engaging in behavior that was unlawful or against a clear mandate of public policy"); *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 34 (D.C. 1991) (holding that it was "unacceptable and unlawful for [Adams's] employer to compel him to choose between breaking the law and keeping his job").

her employment, that does not mean the decision was made because Ms. Bereston refused to break the law.

Second, as recounted above, the complaint alleges that the Hospital was seriously dissatisfied with Ms. Bereston's performance as Director of Admissions for significant and identified reasons other than her refusal or inability to satisfy Dr. Brem's request for more registrars (or her insistence on compliance with health care laws and regulation in general). Staff allegedly were dismayed by the disruption of their working arrangements and complained that Ms. Bereston was "mean and difficult to approach." Numerous physicians allegedly complained that Ms. Bereston was not addressing their problems with registration delays and inadequate admissions staffing. Ms. Bereston's supervisors – the Hospital's Chief Financial Officer and its Chief Operating Officer – had counseled her without apparent success on the need to be friendlier and to improve her leadership and personnel management skills. It got to the point that Ms. Bereston's own staff were insubordinate, and that physicians (again, not only Dr. Brem) were threatening to leave the Hospital because she was failing to satisfy their concerns. Eventually, Ms. Bereston was given a Performance Improvement Plan that identified "leadership" and "satisfaction" as the areas in which she needed to show progress. The factual, non-conclusory allegations of the complaint do not support

Ms. Bereston's charge that the stated reasons for the PIP were euphemistic or pretextual. It also affirmatively appears from the complaint that, after being placed on the PIP, Ms. Bereston continued to make no progress in accommodating or mollifying the unhappy physicians (nor does she allege that she made progress in any other area). If anything, the situation was only getting worse, as Ms. Bereston's final meeting with Dr. Brem demonstrated. Ms. Bereston attributes the discontent and hostility she encountered to the unreasonableness of staff and physicians unwilling to change their ways or moderate their demands, and there may have been fault on all sides. But as this court said in *Wallace*,

> The narrow exceptions to the "employment at-will" doctrine which we have recognized in *Adams* and *Carl* were not designed to prevent an employer from terminating an at-will employee in order to eliminate unacceptable internal conflict and turmoil. It matters little, if at all, who was most at fault. An employer is not required to tolerate an intolerable working environment.[37]

At best, Ms. Bereston's complaint pleads facts that are merely consistent with her theory of the Hospital's liability. It stops well short of making a plausible

---

[37] *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 886 (D.C. 1998); *cf. Davis v. Cmty. Alternatives of Wash., D.C., Inc.*, 74 A.3d 707, 710 (D.C. 2013) ("[W]hatever an employee is doing to promote a public policy interest, she is not immunized from getting fired if she is engaging in serious misbehavior on the job.").

showing that the Hospital's sole or even predominant reason for discharging her was her refusal to violate the law or a clear mandate of public policy.

## B. Harassment and Retaliation

## 1. Uncertain Cognizability of the Proposed Cause of Action

The second count of Ms. Bereston's complaint asserts that the Hospital violated "District of Columbia public policy" by harassing her and retaliating against her "for her efforts to bring the employer into compliance with the several laws and regulations governing its operation."[38] As Ms. Bereston acknowledges, this count advances a new common law tort cause of action (which we may denominate for convenience as "wrongful discipline") that our court has never recognized. When this court formulated the *Adams-Carl* exception to the doctrine of at-will employment, we took pains to emphasize that the tort of wrongful discharge in contravention of public policy is a very narrow one. We did not contemplate the creation of an analogous remedy in tort for adverse employment

---

[38] It may be debatable whether Ms. Bereston's harassment and retaliation claim satisfies *Carl*'s requirements of a clear public policy mandate and a close fit between its furtherance and her conduct, but we do not reach this issue in view of our rejection of the claim on other grounds.

actions less severe than discharge.[39]  The viability of a non-statutory wrongful-discipline claim is a question of first impression in this jurisdiction.

Although many states recognize public policy claims for wrongful discharge, only a handful of courts have considered whether to extend that recognition (in the absence of statutory authorization) to wrongful-discipline claims, and "[t]he few decisions on the subject are divided."[40]  Arguably, creation

---

[39]  *Cf. Darrow v. Dillingham & Murphy, LLP*, 902 A.2d 135, 138 (D.C. 2006) ("Of course, one must first be discharged from his or her employment before being able to take advantage of this legal protection from at-will termination [for refusal to violate a statute].")  *Darrow* held that an at-will employee may have a claim for wrongful discharge under *Adams* even if the discharge was "constructive" rather than "actual." *Id.*  A constructive discharge, which is deemed equivalent to a firing, occurs when the employer deliberately makes working conditions so objectively intolerable that the employee is forced to quit.  *Id.* (citing *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 362 (D.C. 1993)).  Ms. Bereston has not claimed that she was constructively discharged.

[40]  Restatement of Employment Law § 5.01 cmt. c.  *Compare Trosper v. Bag 'N Save*, 734 N.W.2d 704, 711-712 (Neb. 2007) (recognizing cause of action for retaliatory demotion for filing a workers' compensation claim); *Brigham v. Dillon Cos.*, 935 P.2d 1054, 1059-60 (Kan. 1997) (same) and *Greeley v. Miami Valley Maint. Contractors*, 551 N.E.2d 981, 986 (Ohio 1990) (holding that "public policy warrants an exception to the employment-at-will doctrine when an employee is discharged or disciplined for a reason which is prohibited by statute"), *with Touchard v. La Z-Boy, Inc.*, 148 P.3d 945, 955-56 (Utah 2006) (declining to create a new cause of action for retaliatory harassment or discrimination for pursuing a workers' compensation claim); *Below v. Skarr*, 569 N.W. 510, 512 (Iowa 1997) (same); *White v. State*, 929 P.2d 396, 407-08 (Wash. 1997) (refusing to recognize tort cause of action for retaliatory transfer of employee in violation of public policy); *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 905 P.2d 559, 562 (Ariz. Ct.

*(continued…)*

of a wrongful-discipline tort is "a necessary and logical extension"[41] of the wrongful-discharge tort because employers should not be able with impunity to use demotion or other strong measures short of termination to coerce employees to violate the law, to punish them for refusing to do so, or otherwise to thwart public policy. On the other hand, as a practical matter the need to recognize such a broad cause of action to vindicate public policy is not urgent,[42] while doing so would require courts "to become increasingly involved in the resolution of [all manner of] workplace disputes . . . center[ing] on employer conduct that heretofore has not been actionable,"[43] and perhaps "could subject employers to torrents of

---

*(…continued)*
App. 1995) (refusing to recognize cause of action for retaliatory failure to promote); and *Zimmerman v. Buchheit of Sparta, Inc.*, 645 N.E.2d 877, 882 (Ill. 1994) (plurality opinion) (declining to extend cause of action for discharge in violation of public policy to retaliatory conduct such as retaliatory demotion).

[41]  *Brigham*, 935 P.2d at 1059.

[42]  *See, e.g.*, *Touchard*, 148 P.3d at 955 (reasoning that "[w]hile retaliatory discrimination or harassment is deplorable, it does not implicate a clear and substantial public policy to the same extent as a discharge" because the coercive pressure on the employee is not as great).

[43]  *Zimmerman*, 645 N.E.2d at 882 (plurality opinion) (finding no "compelling reason for expanding judicial oversight of the workplace to include review of demotions, transfers, or other adverse work conditions that are alleged to be retaliatory in nature").

unwarranted and vexatious suits filed by disgruntled employees at every juncture in the employment process."[44]

We are wary of attempting to resolve these competing policy considerations by judicial fiat. We have appreciated that in matters such as this, the legislature "is in a far better position than a court to make policy decisions on behalf of the citizenry."[45] Normally, it is up to the legislature to decide whether to attach liability to previously lawful conduct. In the District of Columbia, it is through legislative action that employees currently have causes of action against employers who harass or retaliate against them for engaging in certain activities, namely those protected by the District of Columbia Human Rights Act,[46] the Whistleblower Protection Act,[47] and the Workers' Compensation Act.[48] Whether and how to extend the list of statutorily protected activities so as to protect employees from harassment or retaliation for conduct covered by the *Adams-Carl* public-policy

[44] *Mintz*, 905 P.2d at 562 (quoting *Ludwig v. C & A Wallcoverings, Inc.*, 960 F.2d 40, 43 (7th Cir. 1992)).

[45] *See Rosella*, 121 A.3d at 778 (quoting *Carl v. Children's Hosp.*, 702 A.2d 159, 164 (D.C. 1997) (en banc) (plurality opinion)).

[46] *See* D.C. Code § 2-1402.61 (2016 Repl.).

[47] *See* D.C. Code § 1-615.53 (2016 Repl.).

[48] *See* D.C. Code § 32-1542 (2017 Repl.).

exception to the at-will employment doctrine is presumptively for the Council of the District of Columbia to determine.

## 2. Insufficiency of the Allegations of Retaliation and Harassment

In this case, however, it is unnecessary for us to decide whether to recognize a common-law cause of action for retaliation and harassment offensive to public policy. Were we to do so, we would require the same prima facie showing as is required for comparable claims of retaliation and harassment under the District of Columbia Human Rights Act and other statutes. Under our employment discrimination laws (as under their federal counterparts), a prima facie showing of actionable retaliation requires the employee to show "employer action[] that would have been materially adverse to a reasonable employee."[49] Typically, though not inevitably, such an action is one that has "materially adverse consequences

---

[49] *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006) (construing the anti-retaliation provision of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a)); *Smith v. District of Columbia Office of Human Rights*, 77 A.3d 980, 993 (D.C. 2013). The same standard would appear to apply to the anti-retaliation provisions in our other statutes. *See McCall v. District of Columbia Hous. Auth.*, 126 A.3d 701, 705-07 (D.C. 2015) ("[d]rawing upon case law from the employment discrimination context" in holding that the retaliatory creation of a hostile work environment is a violation of the anti-retaliation provision of the District of Columbia Whistleblower Protection Act).

affecting the terms, conditions, or privileges of employment."[50]  The standard of

*material* adversity is meant "to separate significant from trivial harms" and exclude

"petty slights or minor annoyances that often take place at work and that all

employees experience."[51]  Thus, "[w]hile adverse employment actions extend

beyond readily quantifiable losses, not everything that makes an employee

unhappy is an actionable adverse action."[52]

---

[50]  *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (citation omitted); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").  In *Burlington N.*, the Supreme Court made clear that "the antiretaliation provision . . . is not limited to discriminatory actions that affect the terms and conditions of employment," because "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace."  548 U.S. at 63-64 (emphasis in the original). Ms. Bereston does not allege that the Hospital took retaliatory actions unrelated to her employment or outside her workplace.

[51]  *Burlington N.*, 548 U.S. at 68; *see also id.* ("[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  (Internal quotation marks omitted.)).

[52]  *Markel v. Bd. of Regents of the Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002) (quotation marks and citation omitted).  Courts likewise "have generally held that personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable" under the anti-retaliation provision of Title VII.  *Burlington N.*, 548 U.S. at 68 (quoting 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed. 1996)).

Appellant also claims that the retaliatory harassment to which she was subjected created a hostile work environment. A prima facie showing of a hostile work environment similarly requires the employee to show, *inter alia*, "that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment."[53] The work environment must be objectively as well as subjectively hostile or abusive, "*i.e.*, one that a reasonable person would find hostile or abusive. . . ."[54] In considering whether a pattern of harassment rises to this level, courts must "look[] at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[55] "The harassment must consist of more

---

[53] *Nicola v. Washington Times Corp.*, 947 A.2d 1164, 1173 (D.C. 2008) (citation omitted); *see also Daka, Inc. v. Breiner*, 711 A.2d 86, 93 (D.C. 1998) ("[A] plaintiff has an actionable hostile work environment claim . . . when the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." (internal quotation marks and citation omitted)). The same requirement exists to make out a case of retaliatory hostile work environment under the District of Columbia Whistleblower Protection Act. *McCall*, 126 A.3d at 706.

[54] *Daka*, 947 A.2d at 93.

[55] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

than a few isolated incidents, and genuinely trivial occurrences will not establish a prima facie case."[56]

Ms. Bereston's complaint fails to allege sufficient facts to support a plausible claim of actionable retaliation (i.e., apart from her termination) or hostile work environment. First, Ms. Bereston does not allege that she was demoted or reassigned to a position with different responsibilities, that her salary or benefits were reduced, that she was denied a promotion, salary increase, or bonus, or that she suffered any other significant change in her employment status or materially adverse employment action. We do not deny that "the [mere] imposition of a PIP – even one that does not result in a negative impact on salary, grade or performance appraisal – can constitute an adverse action."[57] However, as we have said, Ms. Bereston's well-pleaded factual allegations fail to support her conclusory assertion that the PIP in her case was issued in retaliation for her putatively protected conduct (either in refusing to violate HIPAA or for her compliance

---

[56] *Nicola*, 947 A.2d at 1173 (internal punctuation and ellipsis omitted) (citation omitted).

[57] *Crowley v. Vilsack*, 236 F. Supp. 3d 326, 330-31 (D.D.C. 2017). This is not to say a PIP is always *materially* adverse to the employee by itself, or that it was so in Ms. Bereston's case.

efforts in general) rather than in response to her identified management deficiencies.

Second, although Ms. Bereston's complaint repeatedly alleges in conclusory terms that she was "bullied, harassed, ridiculed, sabotaged, [and] humiliated" because of her insistence that the Hospital comply with applicable laws, the well-pleaded factual allegations in the complaint fail to demonstrate it. To be sure, Ms. Bereston alleges that she received what she considered unmerited criticism of her job performance (charges of unfriendliness, aloofness, poor leadership and management of her department, excessive rigor in enforcing regulations, not being a "team player") and was counseled by her superiors to improve. On one occasion she was obliged to listen to complaints of her staff that she deemed "frivolous and petty." She encountered disagreement with and opposition to her "unpopular" changes in Hospital procedures and did not receive the credit she believes she deserved. Allegedly, the Hospital's "executives, administrators, and physicians did not respect nor always accept her recommendations to comply with existing law and regulations because it meant changing the status quo, creating inconvenience, and making less profit." Simply put, these allegations may show serious work-related disagreements, criticisms, and dissatisfaction, but without greater specificity, they do not evince the kind of severe and pervasive ridicule,

intimidation, threats, or other abuse that would create a hostile work environment or otherwise constitute actionable harassment or retaliation under our law.[58] Indeed, despite Ms. Bereston's difficulties and understandable stress, her complaint alleges that she continued to perform her job well and does not identify any unreasonable interference with her actual work performance. Moreover, the complaint acknowledges that the Hospital generally implemented the changes she called for in her compliance role, even when her superiors initially were skeptical or reluctant.[59] That Ms. Bereston's role was, in part, that of a compliance officer does not mean she was immune from questioning and critical evaluation of her

---

[58] *See, e.g.*, *Simpson v. Welch*, 900 F.2d 33, 35 (4th Cir. 1990) (general allegations of poor treatment and harassment insufficient to state a claim upon which relief can be granted); *Baez v. Visiting Nurse Serv. of N.Y. Family Care Serv.*, 2011 U.S. Dist. LEXIS 133930 at * 4-5, 15-16 (S.D.N.Y. 2011) (list of grievances, including a meeting at which the plaintiff's boss told her that her complaints were "petty[,]" too trivial to amount to retaliation); *Turrentine v. United Parcel Service, Inc.*, 645 F. Supp. 2d 976, 991 (D. Kan. 2009) (rejecting claim that "UPS, by forcing plaintiff to attend the meeting in which UPS management personnel were at times hostile and intimidating, subjected plaintiff to a materially adverse action") (citing cases).

[59] In point of fact, the factual allegations in Ms. Bereston's complaint suggesting that her superiors or Hospital management were unwilling or reluctant to comply with the Hospital's legal obligations are very thin and fall well short of showing bad motives; the only unwillingness alleged with any specificity was that of Mr. Davis to agree to Ms. Bereston's alteration of Emergency Room admissions procedures early in her tenure, and even Mr. Davis changed his mind when the Hospital's Risk Director sided with Ms. Bereston on the legal need for the change.

performance, or that opposition to her recommendations was in bad faith, let alone that it amounted to actionable harassment or retaliation.

At most, Ms. Bereston's complaint cites a few more or less offensive incidents. It alleges that members of Ms. Bereston's staff were rude and hostile to her after she changed Emergency Room admissions procedures to their displeasure; that Mr. Davis and another Hospital administrator ridiculed her spelling and grammar in an email; that she was given "lip service" when she reported pharmacy billing irregularities; and that Dr. Brem lost her temper with her and screamed at her. By themselves, these were isolated incidents in a two-year period of employment (and at least some of them might fairly be characterized as trivial). They cannot be said to have been severe and pervasive enough to have altered the conditions of Ms. Bereston's employment and created a hostile work environment, or to have constituted materially adverse actions against her by the Hospital.[60]

---

[60] Moreover, while Ms. Bereston rests her claim of retaliatory harassment in part on abusive behavior by her staff and physicians like Dr. Brem, "an employer can only be liable for co-workers' retaliatory harassment where its supervisory or management personnel either (1) orchestrate the harassment or (2) know about the harassment and acquiesce in it in such a manner as to condone and encourage the co-workers' actions." *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1265 (10th Cir. 1998). Ms. Bereston has not alleged that Hospital supervisory or

*(continued…)*

We conclude that Ms. Bereston's complaint fails to set forth sufficient factual allegations to plausibly allege actionable harassment and retaliation. Accordingly, we hold that Count Two (Unlawful Harassment and Retaliation), like Count One (Wrongful Discharge), fails to state a claim upon which relief can be granted.

**IV.**

For the foregoing reasons, we affirm the judgment of the Superior Court dismissing appellant's complaint pursuant to Civil Rule 12 (b)(6) for failure to state a claim on which relief can be granted.

---

*(…continued)*
management personnel orchestrated or acquiesced in abusive behavior by staff or physicians.

FERREN, *Senior Judge*, concurring:  More than two decades ago, in our *Adams*[1] and *Carl*[2] decisions, this court announced common law exceptions to the at-will employment doctrine based on public policy.  In *Adams*, we identified an exception permitting an employee's suit for damages alleging wrongful discharge for refusing the employer's demand to violate the law by driving a truck without a valid inspection sticker.  In *Carl*, we acknowledged an exception justifying a damage action against a hospital for discharging an employee who exercised her right to testify against proposed legislation that would limit malpractice recoveries, against the hospital's interests.  For any new exception, *Carl* established two criteria:  (1) a "clear showing" that "a new exception is needed," derived from an "identifiable policy . . . 'officially declared'" in the Constitution, a statute, or a municipal regulation; and (2) a "close fit" between that policy and "the conduct at issue in the allegedly wrongful termination."[3]

---

[1]  Adams v. George W. Cochran & Co., 597 A.2d 28 (D.C. 1991).

[2]  *Carl v. Children's Hosp.*, 702 A.2d 159 (D.C. 1997) (en banc).

[3]  *Id.* at 164 (Terry, J., concurring), 197 n.2 (Steadman, J., dissenting).

In this case, we conclude, first, that appellant Bereston's complaint did not sufficiently allege a wrongful discharge claim. We then decline her request to recognize a common law exception justifying damages for her employer's alleged "unlawful harassment and retaliation"[4] while she remained on the job. I am adding this concurring opinion to explain my reasons for joining this latter ruling.

According to paragraph 74 of her complaint, Ms. Bereston alleges that her hospital employer violated the District's public policy "by retaliating, harassing and eventually terminating" her employment because of her efforts to bring the hospital "into compliance with the several laws and regulations governing its operation." Although a few jurisdictions have recognized common law exceptions based on public policy for alleged retaliation against an employee short of discharge – commonly demotion for filing a workers' compensation or whistleblower claim[5] – I am reluctant to recognize an unlawful harassment/retaliation exception in this case.

---

[4] Compl. ¶¶ 73-75.

[5] *See Trosper v. Bag 'N Save*, 734 N.W.2d 704, 711 (Neb. 2007) (recognizing a cause of action for retaliatory demotion for filing a workers' compensation claim); *Brigham v. Dillon Companies, Inc.*, 935 P.2d 1054, 1059-60 (Kan. 1997) (same); *Lawson v. AK Steel Corp.*, 699 N.E.2d 951, 953-54 (Ohio Ct. App. 1997) (recognizing a cause of action for the demotion of a whistleblower); *Powers v. Springfield City Schools*, No. 98-CA-10, 1998 WL 336782 at *7 (Ohio

*(continued…)*

A discharge for a clear-cut, easily discernable employee act, such as a refusal to drive (*Adams*) or a decision to testify (*Carl*), can be held unlawful rather easily by reference to public policy clearly reflected in a particular statute or regulation. To the contrary, to recognize Ms. Bereston's common law claim for harassment/retaliation would require substantial fact-finding based on employer/employee interactions over time necessitating definitions of terms, burdens of production and proof, and ultimately resolution of swearing contests involving multiple actors in environments with fluid dynamics. This would take judge-made law to an extreme, from creating a right to creating a regime.

It is obviously true that the kind of fact-finding and law-applying I have just outlined is something the courts do every day, but we do so by applying statutes that spell out all the required ground rules. Thus, as illustrated in the opinion of the court,[6] a judge-made exception here would require us to piggy-back selectively

---

*(…continued)*
Ct. App. June 26, 1998) (unpublished opinion) (recognizing a cause of action for the retaliatory denial of a promotion to an employee who reported child abuse); *Garcia v. Rockwell Internat. Corp*., 232 Cal. Rptr. 490, 493 (Cal. Ct. App. 1986) (recognizing a cause of action for the suspension without pay of a whistleblower).

[6] See *ante* text accompanying notes 49-56.

and extensively on statutes governing, for example, race and sex discrimination,[7] whistleblowing,[8] and harassment/retaliation in hostile work environments.[9]  This we could do, I suppose, but in doing so for harassment/retaliation claims we would manifestly be competing with the D.C. Council to create causes of action of the kind that legislatures, not courts, typically undertake, given the complexity of the subject and the legal structure required.  I do not go so far as to say that our local legislature has preempted the employment-rights field; I conclude merely that, given the established legislative concern about enacting and protecting the rights of employees under a number of existing District statutes, it seems to me both awkward and pretentious to recognize an exception to the at-will doctrine that would reflect an obvious, intrusive move into the legislative arena.

---

[7]  District of Columbia Human Rights Act, D.C. Code § 2-1402.11 (2017 Repl.).

[8]  District of Columbia Whistleblower Protection Act, D.C. Code § 1-615.52 (6) (2017 Repl.).

[9]  D.C. Code §§ 2-1402.61 (District of Columbia Human Rights Act), 1-615.53 (District of Columbia Whistleblower Protection Act), 32-1542 (2017 Repl.); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3 (a).

I am not, however, averse to extending common law rights of recovery when appropriate.[10] In at least two areas that I have noted, workers' compensation and whistleblower protection, state courts have applied wrongful discharge analysis to wrongful demotions.[11] In these instances of asserting clear-cut rights, grounded in statutory public policy – and, like *Adams* and *Carl*, typically uncomplicated by controversy over what the employee did – it seems "inconsistent to recognize a cause of action for retaliatory discharge, but not demotion."[12] Indeed, it is more than a little incongruous to permit – without penalty – a hostile employer to humiliate rather than fire an employee (and likely drive the employee, instead, to voluntarily quit).

Unlike the factual fight in the typical harassment/retaliation case like Ms. Bereston's, where the sides have conflicting stories to tell, a typical demotion for assertion of whistleblower protection or workmen's compensation would generate controversy only over an employer's reasons for demoting an employee who asserts an unquestionable right or duty. I say "typical" demotion because, of

---

[10] *Carl*, 702 A.2d at 166 (Ferren, J., concurring).

[11] *Trosper*, 734 N.W.2d at 711; *Dillon*, 935 P.2d at 1059-60; *Lawson*, 699 N.E.2d at 953-54.

[12] *Trosper*, 734 N.W.2d at 710.

course, even that predicate for a common law action on occasion may invite controversy and dilute my point here. Nonetheless, I perceive a material distinction between challenging retaliation for clear-cut, right-or-duty-based assertions by employees, and an employee's effort to establish harassment/retaliation as a common law basis for challenging employer discipline, short of discharge, in an area requiring a superstructure of rules and where, in part, the legislature has already spoken.

I, therefore, concur separately in the opinion of the court to assure that nothing we say here forecloses efforts to achieve common law causes of actions, as appropriate, in the employment area.

MCLEESE, *Associate Judge*, concurring in part and dissenting in part: The opinion for the court affirms the trial court's dismissal of Ms. Bereston's complaint. I agree as to Ms. Bereston's wrongful-termination claim, for the reason stated in Part III.A.2, which I join: the complaint fails to adequately allege that Ms. Bereston was being directed to violate HIPAA in connection with patient-registration procedures. The court need not address whether the complaint was deficient in the other respects identified in Part III.A.3, and I therefore do not join

that part of the court's opinion. Although I see no reason to belabor the point, I do not agree with the conclusions reached in Part III.A.3. In my view, the complaint sufficiently alleges that Ms. Bereston's employment was terminated because Ms. Bereston refused to do what she was being directed to do with respect to patient-registration procedures.

I respectfully dissent as to Ms. Bereston's claim of what might be called wrongful discipline in violation of public policy. As the opinion for the court notes, *ante* at 31, this court has not yet decided whether to recognize such a claim. Other courts have divided on the question, *ante* at 32 n.40, and the Restatement of Employment Law "expresses no view" on the question. § 5.01 cmt. c (Am. Law Inst. 2015). I agree with the courts that have concluded that the relevant considerations on balance favor recognizing such claims. We initially recognized a claim for wrongful termination because it would be "patently contrary to the public welfare" to permit an employer "to require [its] employees to break the law as a condition of continued employment." *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 32 (D.C. 1991) (internal quotation marks omitted). Although we described the doctrine of wrongful termination as "very narrow," *id.* at 34, we have since expanded the doctrine in a variety of ways. *See Rosella v. Long Rap, Inc.*, 121 A.3d 775, 778 (D.C. 2015) (recognizing that doctrine was subsequently

extended to cover termination in violation of clear public policy); *Darrow v. Dillingham & Murphy, LLP*, 902 A.2d 135, 138 (D.C. 2006) (applying doctrine in case of constructive rather than actual termination). *See generally Carl v. Children's Hosp.*, 702 A.2d 159, 160 (D.C. 1997) (en banc) (per curiam) ("There is nothing in the *Adams* opinion that bars this court—either a three-judge panel or the court en banc—from recognizing some other public policy exception when circumstances warrant . . . .").

In my view, it would also be patently contrary to the public welfare to permit employers to impose harsh adverse employment consequences short of termination on employees to coerce employees to violate the law or to punish employees for refusing to break the law. I acknowledge the court's concern about injecting the courts unduly into the employment relationship. *Ante* at 32-34. As the court notes, *ante* at 34, other statutes -- such as the Human Rights Act, the Whistleblower Protection Act, and the Workers' Compensation Act -- provide employees with causes of action based on retaliation short of termination. Judicial enforcement of those provisions has not proven infeasible, and I see no reason why claims of wrongful discipline would be any more difficult to resolve. I also note that the Supreme Court has held that several federal statutes contain an implied right to be free from retaliation. *See, e.g., CBOCS W., Inc. v. Humphries*, 553 U.S. 442

(2008) (42 U.S.C. § 1981); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) (20 U.S.C. § 1681 et seq. (Title IX)). Those holdings demonstrate that inferring a right to be free from retaliation and determining the scope of that right do not exceed the proper judicial function.

I agree with the court that a claim of wrongful discipline in violation of public policy would require the employee to show "employer action that would have been materially adverse to a reasonable employee." *Ante* at 35 (brackets and internal quotation marks omitted). I do not agree, however, that Ms. Bereston's complaint was properly subject to dismissal under that standard. *Ante* at 38-42. The complaint alleges that staff called Ms. Bereston names, made remarks about her race, and screamed in her face; supervisory personnel failed to discourage that conduct and refused to let Ms. Bereston respond; a supervisor suggested that Ms. Bereston's job security would be endangered if she insisted on compliance with the law; supervisory personnel made unwarranted accusations that Ms. Bereston was not a good leader or team player; Ms. Bereston was ridiculed and admonished for minor errors even though other employees were not treated similarly; and Ms. Bereston was unjustifiably placed on a Performance Improvement Plan (PIP). I do not view those allegations as conclusory, and if they are proven it seems to me that a reasonable factfinder could conclude that Ms. Bereston was subjected to

"materially adverse" employer action. *See, e.g.*, *Crowley v. Vilsack*, 236 F. Supp. 3d 326, 330-31 (D.D.C. 2017) ("courts in this jurisdiction consistently have held that the imposition of a PIP—even one that does not result in a negative impact on salary, grade or performance appraisal—can constitute an adverse action") (citing cases).

In sum, I would vacate the dismissal of Ms. Bereston's wrongful-discipline claim and remand for further proceedings. I therefore respectfully dissent in part.