*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-CV-0568

PETER GORDON *et al.*, APPELLANTS,

V.

DISTRICT OF COLUMBIA *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2016-CA-004493-B)

(Hon. Elizabeth C. Wingo, Hon. Steven M. Wellner
& Hon. José M. López, Trial Judges)

(Argued April 6, 2022       Decided February 15, 2024)

*Don Padou* for appellants.

*Grace Fuscoe*, Assistant Attorney General at the time, for appellees. *Karl A. Racine*, Attorney General for the District of Columbia at the time, *Loren L. AliKhan*, Solicitor General at the time, *Carl J. Schifferle*, Deputy Solicitor General, and *Harrison M. Stark*, Assistant Attorney General at the time, were on the brief for appellees.

Before EASTERLY and DEAHL, *Associate Judges*, and THOMPSON, *Senior Judge*.

EASTERLY, *Associate Judge*: Peter and John Gordon ("the Gordons") sued the

District of Columbia for claims related to the designation of their family home as a

historic property by the Historic Preservation Review Board. The Superior Court dismissed some of the Gordons' claims in an order partially granting the District's motion to dismiss and subsequently dismissed the Gordons' remaining claims in an order granting the District's cross-motion for summary judgment. The Gordons appeal both orders. We hold that the Superior Court erred in granting summary judgment to the District on the Gordons' claim that District employee Kim Williams' entry into their home constituted common law trespass. We otherwise affirm the judgment of the Superior Court.

## I.      Facts and Procedural History

In 2014, brothers Peter and John Gordon inherited their childhood home, located at 3020 Albemarle Street, NW, in the Forest Hills neighborhood of the District. Intending to sell the house, the Gordons signed a listing agreement with Long & Foster Real Estate, Inc. and hired Adam Pollin as their listing agent. The listing agreement authorized Long & Foster to market the house by displaying the property online and to "allow key-entry showings and the installation of a lock box" for members of local realtor associations to access the house in order "to accompany prospective buyers, inspectors, . . . and other parties necessary for showings and inspecting the Property." The Gordons requested that Mr. Pollin refrain from holding any open houses and limit the house showings to appointments only.

Concerned that the property was being sold as a development opportunity, a group of individuals undertook an effort to preserve the house in its current state by nominating it for historic landmark designation. Among these individuals was Sally Berk, a historic preservation consultant. Ms. Berk in particular made a vigorous but secretive push for historic designation of the Gordon house (and sought a four-figure payment for this work). To this end, Ms. Berk retained Denise Warner, a real estate agent with Long & Foster and the president of the Forest Hills Neighborhood Alliance, as her real estate agent to gain "access to the [Gordon] house on the pretext that [she was a] serious shopper[]."[1] She planned to maintain this façade "to protect Denise [Warner]" and then "ghost write[]" the petition to nominate the property for historic preservation.

Ms. Berk and Ms. Warner entered the Gordon house on April 30, 2015, after Ms. Warner reached out to Mr. Pollin asking if he was available to meet Ms. Warner and "clients" for a "tour." Mr. Pollin instructed that the group could let themselves in with the keys in the lockbox.

---

[1] Although Ms. Berk later testified at her deposition that she and her husband had contemplated purchasing the Gordon home, in emails contemporaneous with her engagement of Ms. Warner she acknowledged that she and her husband were not in a position to buy it because they had just purchased a different property five months earlier.

Soon after her first visit, Ms. Berk organized a second tour of the Gordon house, to which she invited, among others, Kim Williams, a staff member of the District's Historic Preservation Office ("HPO") and a longtime friend of Ms. Berk.[2] In an email to a group that included Ms. Williams, Ms. Berk disclosed that she was "strategizing [the] rescue" of the Gordon house; she explained, "there's a real estate agent (not the listing agent) in Forest Hills who wants to save it," and that this "sympathetic-to-preservation agent" had made arrangements for the group to photograph the house for the landmark petition. Ms. Williams accepted Ms. Berk's invitation to view the house, replying via email, "I would love to have a site visit." (Ms. Williams later explained in her deposition that site visits are a precursor to writing a staff report, which is later submitted to the Historic Preservation Review Board ("HPRB"), the District agency responsible for reviewing and granting applications for historic landmark designation.)

In a separate email, Ms. Berk extended invitations to view the property to: Dave Maloney, the head of the HPO; Steve Callcott, Ms. Williams's supervisor at the HPO; and Gretchen Pfaehler, the chairperson of the HPRB. Ms. Berk stated in her email that her "favorite house in Washington" was "threatened."

---

[2] Ms. Berk has invited Ms. Williams and her family to Ms. Berk's vacation home in the Adirondacks "approximately a half-dozen times over the 17 years that [Ms. Berk has] owned the cabin," and Ms. Williams has accepted those invitations "two or three times."

On May 7, 2015, Ms. Warner met Ms. Berk and a group of her "friends and colleagues" at the Gordon home and let them in. Ms. Warner later testified at her deposition that she did not know any of Ms. Berk's companions and, though they introduced themselves to her, she indicated that their identities were not a concern to her. Ms. Williams visited the home with Ms. Berk's group, although she testified at her deposition that she arrived separately, "knocked on the door [of the house,] and was invited in." Ms. Williams further testified that Ms. Warner, who Ms. Williams did not know, seemed to be expecting her and "introduced herself when [Ms. Williams] arrived." Ms. Williams testified she was "pretty sure" that Ms. Warner was the person who let her into the Gordon house. When asked who the representative was who "could give consent on behalf of the [Gordons] to conduct a site visit" that day, Ms. Williams responded that she "assumed that the realtor was representing the owner. . . [because] that's what realtors do." According to Ms. Williams, once she entered the home, she "took a quick tour, went out to the deck, looked out on to the site, . . . went upstairs[,] . . . went outside to photograph the exterior," and "gave [her] professional advice" to Ms. Berk's group about the landmark application process.

On May 10, 2015, three days after Ms. Williams's visit to the house, Ms. Warner introduced Ms. Berk to the Gordons' realtor, Mr. Pollin, and informed him via email of Ms. Berk's "interest[] in preparing the materials necessary to

landmark the home . . . with the DC Historic Preservation Review Board." In his email back to Ms. Warner, Mr. Pollin asked, "[s]o you brought her inside and took photos? And didn't bring in a purchaser?" Ms. Warner responded, "I was told that a potential purchaser would be with Sally [Berk]" on May 7, 2015, but "[a]pparently, he could not make it and she tells me that we will reschedule with him." On May 11, 2015, the Forest Hills Neighborhood Alliance submitted a petition, drafted partly by Ms. Berk, nominating the Gordon house to be designated a historic landmark. Around this same time, Ms. Berk was awarded a lifetime achievement award by the HPRB.

Weeks after submission of the Gordon petition to the HPRB, Ms. Berk invited HPRB Chairperson Ms. Pfaehler to her home in the Adirondacks, the same property Ms. Williams had visited, *see supra*, n.2. Ms. Pfaehler responded, "[t]hat would be lovely. Thank you for the gracious invitation." In early July 2015, Ms. Berk informed Ms. Williams that she would like to recommend Ms. Williams's husband, an architect, for a commission to design a museum. Ms. Williams replied, "I think he would consider it, and if not, he should, so I will talk to him," and asked for more information on the project.

Soon after this email exchange, Ms. Williams submitted her staff report for the Gordon house, which contained input from Mr. Maloney, recommending that HPRB approve the historic designation petition. Days before the HPRB hearing,

Ms. Berk texted Ms. Williams to thank her "for the positive staff report." Ms. Berk followed up with another text asking Ms. Williams if her thank you note was "incriminating."

On July 23, 2015, the HPRB held a two-hour hearing to consider the petition. Parties in favor of the designation, including Ms. Berk, spoke at the hearing. Ms. Williams also presented her case based on the staff report she had drafted. Peter Gordon spoke in opposition and brought an architect to substantively challenge the staff report. At the end of the hearing, the HPRB voted 3-2 to designate the Gordon house a historic landmark. All three of the board members who voted in favor indicated that their vote was based, at least in part, on the staff report. Ms. Pfaehler was one of the three who voted in favor of the designation.

Four days after the HPRB's vote, Ms. Berk invited Ms. Williams to stay at her Adirondacks home in late August or September. Ms. Williams, expressing interest, indicated she and her husband were coordinating summer plans with their children's travel, and responded, "great job and congrats at HPRB." Ms. Berk then thanked Ms. Williams, saying "it wouldn't have happened without you." A few months later, Ms. Williams texted Ms. Berk asking that she "keep all emails to [her] on [a] professional level," because the Gordons had "submitted a FOIA request." Months after that, Ms. Berk wrote Ms. Williams an email with the subject line "BRIBE," again offering Ms. Williams a week at the Adirondacks cabin.

Before the designation, the Gordons had received an offer to purchase their home for $1.55 million dollars, but that offer was withdrawn the day after the Historic Preservation designation. The same buyers later made the Gordons another offer for $1.2 million dollars; they cited the landmark designation as the reason for their reduced offer.

Almost a year after the designation of their home as a historical landmark, the Gordons filed a complaint against the District and several named defendants,[3] alleging twenty-two constitutional and common law claims and seeking damages and equitable relief. The District filed a motion to dismiss pursuant to Rule 12(b)(6), which the Superior Court (Judge Wellner) granted in part and denied in part. In relevant part, the court dismissed the Gordons' claims that: (1) the District violated the Procedural Due Process Clause of the Fifth Amendment by failing to provide adequate notice and opportunity to be heard; (2) the $350,000 reduction in the value of the Gordon home resulted in an unconstitutional taking; and (3) the District allowed for a pattern and practice of warrantless searches to occur in violation of the Fourth Amendment.

---

[3] The Gordons have since settled with or voluntarily dismissed claims against the majority of the individual defendants in this case. For purposes of our review, there are two remaining named defendants: Kim Williams and David Maloney.

After the Superior Court issued its partial dismissal ruling, the Gordons filed an amended complaint. The Gordons then moved for summary judgment and the District cross-moved for the same relief. The court (Judge Wingo) granted the District's motion for summary judgment on the remainder of the Gordons' claims, ruling, in relevant part, that: (1) Ms. Williams was entitled to qualified immunity on the Gordons' Fourth Amendment claim and on their common law trespass claim; (2) Mr. Maloney was entitled to qualified immunity from supervisory liability with respect to the Gordons' Fourth Amendment claim; and (3) the District was entitled to summary judgment on the Gordons' Fourth Amendment claim and their due process claims that the District failed to provide them with adequate process or a neutral decision-maker. This timely appeal followed.

## II. Analysis

Before this court, the Gordons raise challenges to the Superior Court's May 17, 2017, ruling dismissing some of their claims and its March 11, 2019, ruling granting summary judgment as to the rest.

To survive a motion to dismiss, a plaintiff's complaint "must set forth sufficient information to outline the legal elements of a viable claim for relief or to permit inferences to be drawn . . . that indicate that these elements exist." *Chamberlain v. Am. Honda Fin. Corp.*, 931 A.2d 1018, 1023 (D.C. 2007) (internal quotation marks omitted). We assume the truth of "well-pleaded factual

allegations," so long as they are sufficient "to raise a right to relief above the speculative level." *Bereston v. UHS of Delaware, Inc.*, 180 A.3d 95, 99 (D.C. 2018) (internal quotation marks omitted).

At the summary judgment stage, the burden is on the moving party to "demonstrate that there is no genuine issue of material fact, and that [they are] entitled to judgment as a matter of law." *Abdullah v. Roach*, 668 A.2d 801, 804 (D.C. 1995). "Though we view the evidence in the light most favorable to the non-moving party, . . . a party opposing a motion for summary judgment must produce at least enough evidence to make out a prima facie case in support of his claim." *Kotsch v. District of Columbia*, 924 A.2d 1040, 1045 (D.C. 2007).

Our review of both an order granting a motion to dismiss and an order granting summary judgment is de novo. *Williams v. District of Columbia*, 9 A.3d 484, 488 (D.C. 2010); *Kotsch*, 924 A.2d at 1044. Here, we analyze the Superior Court's challenged rulings under the standards set forth above, grouping together the Gordons' claims related to Ms. Williams's entry into their home and their claims related to the designation of their home as a historic landmark.

## A. Ms. Williams's Entry into the Gordons' Home

The Gordons challenge the Superior Court's dismissal at the summary judgment stage of their claims that (1) Ms. Williams, by entering the Gordon home without consent or a warrant to search for evidence to support her staff report

recommending that the home be designated a historic landmark, violated the Gordons' Fourth Amendment rights; (2) the District and Mr. Maloney failed to train or supervise Ms. Williams with respect to her obligations under the Fourth Amendment and are thus liable for Ms. Williams's Fourth Amendment violation; and (3) Ms. Williams, by entering into the Gordon home without consent, trespassed on their property. We address these claims in turn.

**1.    The Gordons' Claim that Ms. Williams Violated Their Rights under the Fourth Amendment**

The Gordons argue that the Superior Court erred when it determined that Ms. Williams is entitled to qualified immunity on the Gordons' claim that she violated their rights under the Fourth Amendment and granted summary judgment on that basis. In deciding whether a government official is entitled to qualified immunity, a court must consider (1) "whether the plaintiff's allegations, if true, show that the officer's conduct violated a constitutional or statutory right," and (2) "whether the right that had been violated was clearly established at the time the alleged violation occurred." *Scales v. District of Columbia*, 973 A.2d 722, 727 (D.C. 2009) (internal quotation marks omitted). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Although the Superior Court stated that it was "not wholly persuaded that—under the particularized facts of this case—Williams's conduct constitute[d] a Fourth Amendment violation" because Ms. Williams's reliance on Ms. Warner's "apparent authority to allow her entry was [not] in any way unreasonable," the court assumed without deciding that Ms. Williams's actions violated the Gordons' Fourth Amendment rights. But the court ruled that the Gordons failed to establish that Ms. Williams violated "clearly established" law at the time of her entry.

The court did not disagree with the Gordons' broad propositions that (1) "the warrantless search of a home is *per se* unreasonable,"[4] and (2) "the third-party

---

[4] Unless an exception to the warrant requirement applies, the Fourth Amendment protects the home against unconsented-to, warrantless physical intrusions by the government. *See, e.g.*, *United States v. Jones*, 565 U.S. 400, 404-05 (2012) (concluding that there was an unconstitutional search when "[t]he Government physically occupied private property for the purpose of obtaining information"); *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75 (1971) (explaining that "[b]oth sides to the controversy" over the Fourth Amendment's warrant requirement "appear to recognize a distinction between searches and seizures that take place on a man's property . . . and those carried out elsewhere. It is accepted . . . that a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances'"); *see generally Kyllo v. United States*, 533 U.S. 27, 31 (2001) ("At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.") (internal quotation marks omitted); *Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals."); *Oliver v. United States*, 656 A.2d 1159, 1164 (D.C. 1995) ("It is axiomatic that the physical entry of

granting consent to the warrantless search must have 'common authority' over the premises."[5]   But the Superior Court determined that these "general [Fourth Amendment] principles do not adequately address the unique," or "particularized" "factual circumstances of this case."  Departing from the District's argument (which focused on consent, *see infra*), the court specifically relied upon the "factual dissimilarity between this case"—where Ms. Williams was "not a law-enforcement officer, and did not enter [the Gordons'] property in order to investigate any wrongdoing, nor did her entry result in any adverse law enforcement action against [the Gordons]"—and "the lion's share of Fourth Amendment cases," which "arise in instances with some connection to an investigation of criminal conduct, or at least of wrongdoing."

---

the home is the chief evil against which the wording of the Fourth Amendment is directed.") (internal quotation marks omitted).

[5] Actual or apparent authority may suffice to authorize a third party to grant consent to a search of property that is not their own.  *See United States v. Matlock*, 415 U.S. 164, 171 (1974) (recognizing that consent to search may be obtained from "a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected"); *accord In re J.F.S.*, 300 A.3d 748, 755 (D.C. 2023) (explaining that "[a] third party has the authority to consent to a search or seizure if they have 'joint access [to] or control' over the property such that the property's owner is thought to have 'assumed the risk' that they might permit a search or seizure of the property") (quoting *Matlock*, 415 U.S. at 171 n.7); *see also Illinois v. Rodriguez*, 497 U.S. 177 (1990) (holding that a warrantless search based on the consent of a third party is valid if the searching officer reasonably believes the third party has the authority to consent, even if facts developed later show their belief to be incorrect).

While the "lion's share of Fourth Amendment cases" may indeed "arise in instances with some connection to an investigation of criminal conduct," the Supreme Court has never held criminal investigation to be the sole trigger of Fourth Amendment protections. Quite the opposite, more than fifty years ago, the Supreme Court opined that it would be "anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." *Camera v. Mun. Ct. of City & Cnty. of S.F.*, 387 U.S. 523, 530 (1967). The Court explained that "even the most law-abiding citizen has a very tangible interest in limiting the circumstances under which the sanctity of his home may be broken by official authority, for the possibility of criminal entry under the guise of official sanction is a serious threat to personal and family security." *Id.* at 530-31; *accord Wyman v. James*, 400 U.S. 309, 317-18, 323 (1971) (reiterating that "one's Fourth Amendment protection subsists apart from his being suspected of criminal behavior" and concluding that a caseworker's warrantless visit to a welfare beneficiary's home did not violate the Fourth Amendment because it was not unreasonable under the circumstances).

The Supreme Court has repeatedly affirmed that proposition. *See, e.g., New Jersey v. T.L.O.*, 469 U.S. 325, 335-36 (1985) (acknowledging the "general applicability of the Fourth Amendment to the activities of civil authorities" and noting that "this Court has never limited the Amendment's prohibition on

unreasonable searches and seizures to operations conducted by the police. Rather, the Court has long spoken of the Fourth Amendment's strictures as restraints imposed upon 'governmental action'—that is, 'upon the activities of sovereign authority'") (quoting *Burdeau v. McDowell*, 256 U.S. 465, 475 (1921)); *Michigan v. Tyler*, 436 U.S. 499, 505-06 (1978) ("[D]eviations from the typical police search are . . . clearly within the protection of the Fourth Amendment. . . . Searches for administrative purposes, like searches for evidence of crime, are encompassed by the Fourth Amendment."). More recently, in *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56 (1992) the court reaffirmed "what is evident from our precedents—that the [Fourth] Amendment's protection applies in the civil context as well [as the criminal]," *id*. at 67, and is not limited to investigative activity:

> The reason . . . an officer might enter a house or effectuate a seizure is wholly irrelevant to the threshold question whether the Amendment applies. What matters is the intrusion on the people's security from governmental interference. Therefore, the right against unreasonable seizures would be no less transgressed if the seizure of the house was undertaken to collect evidence, . . . or on a whim, for no reason at all.

*Id*. at 69.[6] The District concedes the point and acknowledges in its brief that "[t]he

---

[6] To the extent that "other courts have," as the Superior Court reasoned, "found the reach of the Fourth Amendment more limited where the entering party carries out a public function but is not a law enforcement officer engaged in an investigation of wrongdoing," the cases the court identified—*United States v.*

Gordons are obviously correct that trespass by government officials into the home may violate the Fourth Amendment."

The government argues instead that it is not clearly established that Ms. Warner lacked the apparent authority to permit Ms. Williams to enter the Gordons' home. Citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) for the proposition that "the 'clearly established' standard . . . demands a high 'degree of specificity'" which is "'especially important in the Fourth Amendment context,'" the District asserts that the Gordons must be able to point to "controlling 'precedent where [an official] acting under similar circumstances' . . . 'was held to have violated the Fourth Amendment.'"[7] More concretely, the government asserts that the Gordons

---

*Attson*, 900 F.2d 1427 (9th Cir. 1990); *State v. Schofner*, 800 A.2d 1072 (Vt. 2002); and *State v. Ellingsworth*, 966 P.2d 1220 (Utah Ct. App. 1998)—are not binding, nor do they muddle the clearly established principles set forth above so as to support the District's claim of qualified immunity. At best, these cases "stand principally for the proposition . . . that the Fourth Amendment does not constrain the activities of persons acting in an essentially private capacity merely because they happen to be government employees," *State v. Schofner*, 800 A.2d 1072, 1080 (Vt. 2002) (Johnson, J., dissenting)—not the scenario here—and, at worst, they simply fail to correctly apply Supreme Court precedent. *See supra*; *see also Jane Doe I v. Valencia Coll. Bd. of Trustees*, 838 F.3d 1207, 1213 (11th Cir. 2016) (explaining that the reasoning in *Attson* that "no 'search' had occurred because the doctor [who took an unconsented-to blood sample to see if the individual was too intoxicated to receive pain medication] was not 'motivated by investigatory or administrative purposes[,]' . . . flies in the face of [the Supreme Court's decision in] *Soldal*").

[7] Federal cases are not in agreement with respect to which party bears the burden of proof on qualified immunity. *Compare Durham v. Jones*, 737 F.3d 291, 299 (4th Cir. 2013) ("The burden of proof and persuasion with respect to a defense

can only prevail in a qualified immunity analysis if they can cite a case where a court has held that a "non-law enforcement employee viewing a publicly listed house to consider the property's historical character, invited as part of an approved realtor tour" violated the homeowner's Fourth Amendment rights. We cannot agree. Although the Supreme Court has cautioned against "defin[ing] clearly established law at a high level of generality," or relying on "broad historical assertions," *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011); *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (The clearly established inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."), it has also rejected the proposition that a plaintiff must be able to cite "a case directly on point." *al-Kidd*, 563 U.S. at 741. Rather, the Court has explained that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not]

---

of qualified immunity rests on the official asserting that defense.") (internal quotation marks omitted) *with Palmieri v. United States*, 896 F.3d 579, 586 (D.C. Cir. 2018) ("When an official asserts qualified immunity, the plaintiff must overcome that assertion by demonstrating (*inter alia*) that the right was clearly established at the time of the alleged violation.") (internal quotation marks omitted). This court has suggested that while the defendant official must affirmatively plead qualified immunity, the plaintiff, bearing the burden of proving a constitutional violation at trial, necessarily also bears the burden of proving that the defendant "violated clearly established rights" and is not entitled to qualified immunity. *Fulwood v. Porter*, 639 A.2d 594, 600 & n.14 (D.C. 1994). The Gordons have not disputed the burden allocation here, so we do not address it.

previously been held unlawful.'" *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Brosseau*, 543 U.S. at 199 ("Of course, in an obvious case, [general Fourth Amendment] standards can 'clearly establish' the answer, even without a body of relevant case law.").[8]

We conclude that this court spoke to the issue of apparent authority over property with sufficient specificity in *In re J.F.S.*, 300 A.3d 748 (D.C. 2023). Analyzing a mother's apparent authority over her child's cell phone, we held that "[t]he nature of a third party's access or control [over property] determines what they may permit others (including the police) to do with that property, and a third party may permit others to do no more than they may do on their own." *Id.* at 755

---

[8] Courts seems to require a higher level of specificity for cases involving exigent circumstances. *See District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (explaining that "the 'specificity' of the rule is especially important in the Fourth Amendment context" because "[p]robable cause turn[s] on the assessment of probabilities in particular factual contexts and cannot be reduced to a neat set of legal rules") (internal quotation marks omitted). *Compare Mullenix*, 577 U.S. at 12-13 (granting qualified immunity to an officer who "confronted a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer" because it is "difficult for an officer to determine how . . . excessive force[] will apply to the factual situation the officer confronts") (internal quotation marks omitted) *with Groh v. Ramirez*, 540 U.S. 551, 563-64 (2004) (denying qualified immunity to an officer who conducted a search pursuant to a warrant that "plainly did not comply" with the Fourth Amendment's particularity requirement because "[n]o reasonable officer could claim to be unaware of the basic rule, well established by our cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional").

(internal quotation marks and brackets omitted). This principle applies with obvious clarity to the facts presented here and compels the conclusion that the nature of Ms. Warner's access to the Gordon home was clearly limited to her role as a real estate agent, not a preservationist. It was therefore unreasonable for Ms. Williams to believe that Ms. Warner had the apparent authority to consent to her entry into the Gordon home for an HPO site visit. Ms. Williams was aware that Ms. Warner was "not the listing agent," but instead a "sympathetic" agent "who want[ed] to save" the Gordon home, and she was aware that Ms. Berk had arranged the tour not because she was considering buying the home, but because she was "strategizing its rescue" and wanted to take photos for the historic nomination application. *See Mullenix*, 577 U.S. at 11 ("A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.") (internal quotation marks omitted).

We must nonetheless uphold the Superior Court's qualified immunity ruling not because of any lack of specificity in our current law but because of temporal considerations. *In re J.F.S.* was decided in 2023, years after Ms. Williams entered the Gordons' home in 2015, and the Supreme Court has held that the "objective legal reasonableness" of an official's action must be "assessed in light of the legal rules that were 'clearly established' at the time the action was taken." *Anderson*, 483 U.S. at 639 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("If the law at [the]

time [the action occurred] was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful")). Accordingly, we affirm the Superior Court's dismissal of the Gordons' Fourth Amendment claim against Ms. Williams on qualified immunity grounds.[9]

**2.      The Gordons' Claim that the District and Mr. Maloney are Liable for Ms. Williams's Alleged Fourth Amendment Violation**

In connection with Ms. Williams's entry into their home, the Gordons alleged that both the District and Mr. Maloney, in his individual capacity, are liable under 42 U.S.C. § 1983 for Ms. Williams's Fourth Amendment violation because they failed to properly train or supervise her, despite being on notice that she and other HPO employees conduct warrantless searches of private homes. The Superior Court granted the District summary judgment, concluding that the Gordons had failed to establish municipal liability with respect to the District, and failed to establish supervisory liability with respect to Mr. Maloney. We affirm both rulings.

---

[9] Accordingly, we need not address the District's argument on the merits, that Ms. Williams's entry into the Gordon home was not a violation of the Gordons' Fourth Amendment rights.

### a) The Gordons' Municipal Liability Claim against the District

To succeed on a § 1983 claim against a municipal entity, a plaintiff must establish that the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict[ed] the injury" alleged. *Monell v. Dep't of Soc. Servs. of City of N. Y.*, 436 U.S. 658, 694 (1978). Because municipal liability is generally established by "prov[ing] that action pursuant to official municipal policy caused [a plaintiff's] injury, . . . [a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a *failure* to train." *Connick v. Thompson*, 563 U.S. 51, 60-61 (2011) (internal quotation marks omitted) (emphasis added). In order to establish municipal liability for a failure to train or supervise, the alleged failure must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Id.* at 61. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 410 (1997). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference." *Connick*, 563 U.S. at 62 (internal quotation marks omitted). In rare instances, however, deliberate indifference can be established under the single

instance theory, which looks to whether "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the . . . city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

The Superior Court (Judge Wellner) dismissed the Gordons' claim against the District at the Rule 12(b)(6) stage, ruling that the Gordons had failed to allege "a pattern of similar constitutional violations by untrained employees" or to plead any facts tending to show that the "District's decisionmakers knew or should have know[n] of any deficiencies." After the Gordons filed an amended complaint in which they alleged that Ms. Williams's viewing of their home was not the "only instance where HPO employees ha[d] ignored the Fourth Amendment," citing *Elkins v. District of Columbia*, 690 F.3d 554, 568-69 (D.C. Cir. 2012),[10] the Superior Court (Judge Wingo) granted summary judgment for the District. The court concluded that the Gordons had again failed to demonstrate a pattern of similar constitutional

---

[10] *Elkins* also involved an HPO official searching a private home and Mr. Maloney again was a named defendant. But *Elkins* was notably distinguishable, both because the search in that case was authorized by a warrant and because the central issue was the illegal seizure of a notebook during the site visit. 690 F.3d at 562-566.

violations and had also not demonstrated an "obvious" case (or "single instance") of deliberate indifference.

On appeal, the Gordons appear only to challenge the Superior Court's order granting the District's Rule 12(b)(6) motion to dismiss, arguing that the court had not "fully appl[ied]" the "single instance" theory of liability to their claim.[11] But the court did apply that theory in its order granting summary judgment to the District, concluding that the Gordons' "unsubstantiated assertion[] that HPO employees will inevitably violate the Fourth Amendment during 'site visits' absent more rigorous training" was "insufficient to meet their burden." For the reasons discussed below, we agree with the Superior Court.

The Gordons argue that it was "patently obvious" to the District that without adequate training or supervision, HPO employees "required" to "enter and search private property for information related to historic preservation" would likely violate

---

[11] The Gordons assert that they "pled sufficient allegations at the motion to dismiss stage to lay out a claim for municipal liability based on a theory of failure to train supported by allegations of a pattern of constitutional violations." But their assertion is conclusory; other than referring to paragraphs in the complaint that mostly concern Ms. Williams's entry into the home on May 7, they do not specify what these allegations were. Further, their assertion that they were somehow subjected to a "heightened pleading standard" is unsupported by any case law. Accordingly, we decline to analyze this theory of liability on appeal. *Wagner v. Georgetown Univ. Med. Ctr.*, 768 A.2d 546, 554 n.9 (D.C. 2001) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

the Fourth Amendment because it knew "to a moral certainty" that HPO employees "frequently" performed these site visits without a warrant. But nowhere do the Gordons suggest that the District knew or had any reason to suspect that HPO employees frequently *need* to obtain warrants for HPO site visits—i.e., that HPO employees regularly search private properties without the consent of homeowners or their authorized agents. Thus, the "unconstitutional consequences" of the District's failure to train employees who perform site visits without first obtaining warrants cannot fairly be said to be "patently obvious," and the Gordons' acontextual assertion is insufficient to establish the District's liability for Ms. Williams's alleged Fourth Amendment violation under a "single instance" theory.

### b) Mr. Maloney's Supervisory Liability

With respect to the Superior Court's determination that Mr. Maloney is entitled to qualified immunity because the Gordons failed to "show that [Mr.] Maloney's conduct violated their constitutional rights," *see Scales*, 973 A.2d at 727, the Gordons contend that the court "did not view the evidence in the light most favorable to [them]; drew inferences in favor of Mr. Maloney; and weighed evidence in favor of Mr. Maloney." We disagree and affirm the Superior Court's dismissal of the Gordons' § 1983 claim against Mr. Maloney.

"[A] governmental officer may be held liable in damages for constitutional wrongs engendered by his failure to supervise or train subordinates adequately" if the plaintiff can show that (1) "he was responsible for supervising the wrongdoer," (2) "a duty to instruct the subordinate to prevent constitutional harm arose from the surrounding circumstances," and (3) "as a result of the official's failure to instruct, the plaintiff was harmed in the manner threatened." *Haynesworth v. Miller*, 820 F.2d 1245, 1259, 1262 (D.C. Cir. 1987), *abrogated on other grounds by Hartman v. Moore*, 547 U.S. 250 (2006). But like municipal liability, "[s]upervisory liability is limited under § 1983." *Elkins*, 690 F.3d at 565. It "is triggered only when a supervisor fails to provide more stringent training in the wake of a history of past transgressions by the agency or provides training 'so clearly deficient that some deprivation of rights will *inevitably* result absent additional instruction.'" *Id.* at 566 (quoting *Int'l Action Ctr. v. United States*, 365 F.3d 20, 27 (D.C. Cir. 2004)). Moreover, "where responsibility is predicated on inattentiveness rather than affirmative misconduct, the plaintiff must establish a high degree of fault in order to implicate the supervisor." *Haynesworth*, 820 F.2d at 1261.

Mr. Maloney's knowledge "that Ms. Williams [had] conducted 'site visits' of private properties" is not evidence of "past transgressions" that would suffice to put him on notice of possible unlawful searches by HPO employees, and thus, of the necessity of Fourth Amendment training. Though the Gordons allege that

Mr. Maloney "knew that Ms. Williams had not obtained a warrant authorizing her to enter the Gordon Home," they do not allege that he knew that Ms. Williams had not obtained consent from the Gordons or their authorized representative and might therefore risk violating the Gordons' Fourth Amendment rights. As with their failure-to-train claim against the District, *supra* Part II.A.2.a., the Gordons cannot meet their evidentiary burden with this conclusory line of reasoning.

### 3. The Gordons' Claim that Ms. Williams Trespassed on Their Property

The Gordons claim that Ms. Williams's entry into their home constituted common law trespass. At summary judgment, the Superior Court concluded that because Ms. Williams was entitled to qualified immunity on the Gordons' Fourth Amendment claim, *see infra* Part II.A.1., she was likewise entitled to immunity on the Gordons' trespass claim. For the following reasons, we reverse and remand this claim to the Superior Court.

Qualified immunity is a doctrine of federal law; it shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 555 U.S. at 231 (quoting *Harlow*, 457 U.S. at 818). Qualified immunity does not shield government officials from liability for common law torts, like a claim of trespass. *Scales*, 973 A.2d at 730 n.5 ("[Q]ualified

immunity from § 1983 does not preclude a suit based on common law negligence, or any other state law tort, for that matter.") (internal quotation marks and citation omitted). Instead, whether a government official may be sued for negligent or intentional torts in the District of Columbia generally turns on the doctrine of absolute official immunity.

Unlike qualified immunity, where a court must consider whether a plaintiff's allegations constitute the violation of a constitutional right and whether that right was clearly established at the time of the violation, *see supra* Part II.A.1., when a government official seeks the protection of absolute official immunity against a common law claim, the court must consider whether (1) "the official acted within the 'outer perimeter' of his official duties," and (2) "the particular government function at issue was 'discretionary' as opposed to 'ministerial.'" *Moss v. Stockard*, 580 A.2d 1011, 1020 (D.C. 1990). Determining whether an official acted within the outer perimeter of his duties generally "calls for a relatively straight-forward identification of the act giving rise to the suit and an analysis of the official's proper functions and duties." *Id.* But "[d]istinguishing discretionary acts"—which cannot serve as the foundation for liability under tort law—"from ministerial ones"—which can—"involves a more complex analysis which," importantly, "goes beyond determining simply whether the act entailed a choice among alternatives." *Id.* Rather, "th[e] distinction turns on whether imposition of liability would more likely

encourage or inhibit conscientious, effective performance of the particular governmental function at issue." *District of Columbia v. Thompson*, 570 A.2d 277, 296 (D.C. 1990), *rev'd on other grounds*, 593 A.2d 621 (D.C. 1991). In contrast to ministerial acts, which "require the execution of a policy as distinct from its formulation," discretionary acts are "those involving policy considerations where no statutory or regulatory requirements [limit] the exercise of policy discretion," *Rustin v. District of Columbia*, 491 A.2d 496, 500 (D.C. 1985) (internal quotation marks omitted), and "for which there is no reason to believe a jury would render a sounder decision than those officials chosen, qualified, and prepared to make them," *Chandler v. District of Columbia*, 404 A.2d 964, 966 (D.C. 1979).

To assist in the task of determining whether the government function at issue was discretionary or ministerial, a court should weigh the following policy factors: "(1) the nature of the injury, (2) the availability of alternate remedies, (3) the ability of the courts to judge fault without unduly invading the executive's function, and (4) the importance of protecting particular kinds of acts." *Moss*, 580 A.2d at 1021 (citing *Thompson*, 570 A.2d at 297). This list, however, "is not exclusive; a court may use other factors it deems relevant." *Minch v. District of Columbia*, 952 A.2d 929, 939 (D.C. 2008). Moreover, the court should "[v]iew[] the case from both the plaintiff's and the official's perspective[s]" and "evaluate whether the contribution to effective government of the immunity urged would or would not outweigh the

harm to the plaintiff." *Moss*, 580 A.2d at 1021. *See also Minch*, 952 A.2d at 939 ("The distinction between discretionary and ministerial actions by government officials is designed to assure fearless, vigorous, and effective decision-making . . . and to determine whether society's concern to shield the particular government function at issue from the disruptive effects of civil litigation requires subordinating the vindication of private injuries otherwise compensable at law.") (internal quotation marks omitted).

The District concedes that qualified immunity, which it successfully urged the Superior Court to grant Ms. Williams, does not apply to the Gordons' common-law trespass claim. But the District asserts that even though qualified immunity is "technically distinct," from absolute official immunity, the two "overlap[] substantially," such that "irrespective of how the Superior Court 'labelled' Ms. Williams's immunity, it correctly concluded that her reasonable, official conduct protected her from damages for trespass." Based on our explication of the two immunity doctrines above, we disagree that they are only "technically distinct" and that the Superior Court's qualified immunity analysis can stand in for the requisite absolute official immunity analysis.

Even if we assume without deciding that conducting a site visit is within the outer perimeter of Ms. Williams's duties, the Superior Court engaged in none of the analysis above to discern whether conducting a site visit constitutes a discretionary

or ministerial act. The District likewise skips over this analysis in its brief and simply asserts that "an official acting within the scope of . . . her official duties is protected from suits for civil damages resulting from a 'mistake of fact occurring in the exercise of [her] . . . discretion.'" But, as explained above, if Ms. Williams's site visit was a ministerial act, it is not covered by absolute official immunity.[12] The

---

[12] In support of its argument that the Superior Court's "qualified immunity analysis for the [Gordons'] Fourth Amendment claim effectively resolved Ms. Williams's immunity for the [Gordons'] trespass claim," the District also looks to what it asserts is the "closely related context of false imprisonment or unlawful seizure" in which "this Court has long applied the 'good faith reasonable privilege'" to shield officials from liability."

First, given that arrests are, for absolute immunity purposes, recognized to be ministerial acts, *Wade v. District of Columbia*, 310 A.2d 857, 860 (D.C. 1973), this argument only underscores the importance of the inquiry that has yet to be done into the nature of Ms. Williams's site visit.

Second, it is true that this court has determined that when police officers are sued for common law claims in connection with an arrest (e.g., assault, battery, false arrest, and false imprisonment) they are unprotected by absolute immunity but may enjoy a qualified privilege if they acted reasonably and in good faith. *See id.* at 862. But this court has never extended that qualified privilege to claims of trespass on private property. Moreover, the inquiry for this good faith qualified privilege is partially subjective, whereas the inquiry for absolute immunity is entirely "objective in nature." *Moss*, 580 A.2d at 1020 n.18. *See Scales*, 973 A.2d at 730 (explaining that "the test for qualified privilege in an assault and battery suit is both subjective and objective: the officer must subjectively believe that he or she used no more force than necessary" and "the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation"). For these reasons, the "closely related . . . underpinnings between the defense of qualified privilege against common law tort claims and qualified immunity from constitutional claims" that this court observed in *Kotsch*, 924 A.2d at 1047 n.7, are limited to those torts associated with arrest and irrelevant to this court's assessment of whether Ms. Williams is

District alternatively argues that the Gordons' trespass claim fails on the merits because Ms. Warner had apparent authority to give Ms. Williams permission to enter the Gordon home. But the Superior Court did not reach the merits, and we likewise decline to do so in the first instance. *Norris v. United States*, 927 A.2d 1034, 1039-40 (D.C. 2007).

In sum, we conclude that the Superior Court erred when it granted summary judgment for the District on the Gordons' common law trespass claim against Ms. Williams based on its determination that she was entitled to qualified immunity on their Fourth Amendment claim. Accordingly, we remand the case to the Superior Court to ascertain whether Ms. Williams is, consistent with our analysis above, entitled to absolute official immunity. The government function to be analyzed on remand is carrying out a visit to the site of a private property, upon the consent of a real estate agent, in order to collect information in support of an HPO staff report. The Superior Court should determine (1) whether this function fell "within the 'outer perimeter' of [Ms. Williams's] official duties," and, (2) keeping in mind the *Thompson* (and any other relevant) policy factors, whether this function "was 'discretionary' as opposed to 'ministerial,'" *Moss*, 580 A.2d at 1020 (quoting *Thompson*, 570 A.2d at 294 & n.14)—recognizing both that "the scope of immunity

_____

absolutely immune from suit on a theory of common law trespass under the analysis set forth above.

should be no broader than necessary to ensure effective governance," *id.* at 1021, and that "the burden of establishing that the official function in question merits absolute immunity rests on the defendant official," *id.* at 1020 n.18.

## B. The Historic Landmark Designation

In addition to challenging the Superior Court's rulings regarding their claims related to Ms. Williams's entry into their home, the Gordons challenge the court's rulings rejecting their claims related to the designation of their home as a historic landmark, and the process of that designation. Specifically, the Gordons argue the Superior Court erred in (1) dismissing pursuant to Rule 12(b)(6) their claim that the historic designation constituted an unconstitutional taking under the Fifth Amendment; (2) dismissing pursuant to Rule 12(b)(6) their claim that the HPRB failed to provide them an adequate opportunity to be heard as required by the Due Process Clause of the Fifth Amendment; and (3) granting the District summary judgment on their claim that the HPRB failed to provide a neutral decision-maker, also as required by procedural due process. We address each of these arguments.

### 1. Fifth Amendment Takings Clause

The Gordons alleged in their complaint that the designation of their home as a historic landmark was an unlawful "regulatory taking" because it caused "a decrease in the value of the house by $350,000." *See D.C. Pres. League v. Mayor's Agent for Historic Pres.*, 282 A.3d 578, 580 (D.C. 2022) (a partial regulatory taking

"impedes the use of property without depriving the owner of all economically beneficial use") (internal quotation marks omitted). The Superior Court ruled that the Gordons had failed to state a claim because they did not allege that there was no "reasonable alternative economic use" of the home once it was designated as a historic landmark, and cited *900 G St. Assocs. v. Dep't of Hous. & Cmty. Dev.*, 430 A.2d 1387 (D.C. 1981). On appeal, the Gordons argue that the court erred by relying on *900 G St. Associates*, and applying what they construe to be a categorical rule for assessing the occurrence of a total taking, rather than the multi-factor inquiry for partial takings mandated by *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978).[13] We disagree.

In *Penn Central*, the Supreme Court identified three factors as having "particular significance" in the "essentially ad hoc, factual inquir[y]" to determine what constitutes a taking: (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action"—i.e., whether the action "can be characterized as a physical invasion by [the] government" or whether it "arises from some public program adjusting the

---

[13] Where a regulation results in a total taking, i.e., "denies all economically beneficial or productive use of land," *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992), a different, categorical test is employed. *Id.* at 1027.

benefits and burdens of economic life to promote the common good." 438 U.S. at 124. Subsequently, in *900 G Street Associates*, this court considered the denial of a permit under the Historic Landmark and Historic District Protective Act of 1978 (the act that established the proceedings at issue in this case) and cited *Penn Central*, referring to all three of the factors the Supreme Court specifically identified, albeit not in list form. *See* 430 A.2d at 1389-91. Given that the public purpose of the alleged partial taking in *900 G Street Associates*—historic designation of the building—had never been contested, *id*. at 1389, the court focused on the "investment-backed expectations" in the property and whether it had a "reasonable alternative economic use," *id*. at 1390-91. And the court rejected a takings claim in that case in absence of a showing that there was no reasonable alternative use for the historically designated property. *Id.* at 1392.

Thus, we disagree with the Gordons' argument that *900 G Street Associates* misunderstood or departed from *Penn Central*'s fact-specific inquiry, the aim of which is to determine "whether the government has gone too far through its regulations and arrogated property to itself without the payment of just compensation to the owner." *Embassy Real Est. Holdings, LLC v. District of Columbia*, 944 A.2d 1036, 1052 (D.C. 2008) (explaining that "[t]here is no single test" for a partial taking and that the *Penn Central* factors merely describe "*general considerations*") (emphasis added, internal quotation marks omitted). And we

likewise disagree that the trial court's reliance on *900 G Street Associates* constitutes reversible error in its takings analysis. Indeed, the court expressly considered both the fact that the Gordons had alleged the historic designation of their home reduced its value by $350,000, and the fact that they still had an offer to purchase the home, albeit at a reduced price—$1.2 million as opposed to $1.5. million. Lastly, we note that the Gordons have failed to explain what factor under the fact-specific *Penn Central* test the Superior Court should have considered but did not that would have made a difference in the court's analysis. For all of these reasons, we affirm the court's determination that the Gordons failed to allege facts sufficient to support a takings claim.

### 2. Procedural Due Process: Opportunity to Be Heard

The Gordons also challenge on appeal the Superior Court's dismissal of their claim that they were denied procedural due process because of the inadequacy of the "evidentiary safeguards" at the HPRB hearing. They highlight the fact that they were not given prehearing discovery, witnesses were not sworn in, and the HPRB neither allowed cross-examination nor barred the admission of hearsay. They assert the Superior Court failed to apply the multi-factor balancing test established in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976),[14] and instead relied on *Donnelly*

---

[14] In *Mathews*, the Supreme Court identified three factors that should be considered in determining whether the procedures provided are constitutionally

*Assocs. v. D.C. Historic Pres. Rev. Bd.*, 520 A.2d 270 (D.C. 1987), to conclude that they received adequate process.

As with their contention that the trial court failed to apply *Penn Central* to their takings claim, *see supra*, Part II.B.1., the Gordons mistake the trial court's decision to rely on this court's jurisprudence implicitly *adopting* Supreme Court jurisprudence with the trial court's failure to apply Supreme Court jurisprudence at all. Though the trial court did not analyze the facts under each prong of the *Mathews* balancing test, it did rely on a case—*Donnelly*—in which this court *did* analyze the facts of the case under each prong of the *Mathews* test before concluding that the HPRB's "ample procedures are . . . well-tailored in light of the decision to be made, to the capacities and circumstances of those who are to be heard." *Donnelly*, 520 A.2d at 285 & 279-85 (internal quotation marks omitted). Given *Donnelly*'s thorough review of the same HPRB rules and similar procedures at issue here, the trial court was not required to re-apply *Mathews* to the facts of this case. *See id.* at 282 ("The *Mathews v. Eldridge* test . . . is applied to the generality of cases; the fundamental fairness of a particular procedure does not turn on the result obtained

---

sufficient: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value . . . of additional or substitute procedural safeguards," and (3) "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335.

in any individual case.") (internal quotation marks omitted). And because this court further held in *Donnelly* that HPRB historic designations are not "contested case[s]," and therefore do not entitle property owners "to a full trial-type hearing," *id.* at 279, 285, we are not persuaded that the Gordons are entitled to the additional evidentiary safeguards—swearing in of witnesses, hearsay testimony, exchanging of witness lists, and limited discovery—that they suggest they are entitled to and which are not addressed in *Donnelly*. *See In re Herndon*, 596 A.2d 592, 595 (D.C. 1991) ("In administrative proceedings . . . parties generally are not entitled to pre-hearing discovery as a matter of constitutional right."); *Acott Ventures, LLC v. D.C. Alcoholic Beverage Control Bd.*, 135 A.3d 80, 89-90 (D.C. 2016) (finding that hearsay could be admitted even in a "contested case" proceeding so long as it was relevant and not cumulative). The Superior Court did not err in its reliance on *Donnelly*, nor did it err in dismissing the Gordons' claim that they were not given an adequate opportunity to be heard.

### 3. Procedural Due Process: Impartial Tribunal

Lastly, the Gordons challenge the Superior Court's dismissal at the summary judgment stage their claim that the District violated their due process rights when it failed to provide a neutral decision-maker during the historic designation process. The Superior Court determined that (1) Ms. Pfaehler's presentation of a lifetime achievement award to Ms. Berk and her failure to firmly reject Ms. Berk's "alleged

bribe" offering Ms. Pfaehler free use of Ms. Berk's home in the Adirondacks did not allow an inference of "corruption," (2) even if Ms. Williams "was herself biased or produced a biased report," she "cannot be fairly characterized as a decision-maker," and (3) in light of "the breadth of conflicting testimony considered by the Board" and the decision of two of the five Board members to vote against historic designation of the Gordon home, the evidence failed to show that the bias of Ms. Williams or her report had an "actual impact" on the Board. The Gordons argue that they were not required to show actual bias and that they pleaded sufficient evidence to show the *appearance* of bias. If Ms. Berk had been the decision-maker here, we would be inclined to agree. But we cannot, from one individual's seeming disregard of the boundaries between the personal and the professional, assume unconstitutional bias on the part of decision-makers without evidence that they were, or appeared to be, themselves responsive to such conduct.

"[A]n impartial decision maker is essential" to the due process right to adequate notice and the opportunity to be heard. *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970). This basic requirement "applies to administrative agencies which adjudicate as well as to courts." *Withrow v. Larkin*, 421 U.S. 35, 46 (1975). *See also Schweiker v. McClure*, 456 U.S. 188, 195 (1982) ("As this Court repeatedly has recognized, due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities."). "Fairness of course requires an absence of

actual bias . . . [b]ut our system of law has always endeavored to prevent even the probability of unfairness." *In re Murchison*, 349 U.S. 133, 136 (1955). To that end, the inquiry into bias "is an objective one. The [c]ourt asks not whether the [decisionmaker] is actually, subjectively biased, but whether the average [person] in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009).

We begin with the alleged "corruption" of Ms. Pfaehler, because we agree with the Superior Court and the District that she is the only party accused of bias who can fairly be characterized as a decision-maker. *See* 10-C D.C.M.R. §§ 218.4, 219.1. Acknowledging that the Gordons were not required to demonstrate that Ms. Pfaehler actually accepted Ms. Berk's offer to let Ms. Pfaehler use the Berk vacation home, we nonetheless conclude that on this record, no reasonable juror could infer even an appearance of bias by Ms. Pfaehler.

Ms. Berk's singular offer must be put in context. Ms. Pfaehler and Ms. Berk did not have a relationship and had very little in the way of contact beyond that one offer. Ms. Pfaehler testified in her deposition that she had only ever seen Ms. Berk at events for preservation or government planning organizations; that aside from the May 2015 email invitation, there was no other invitation by Ms. Berk to a vacation house; that she had never had "detailed conversations" with Ms. Berk and had "never called her on the phone at home or had any other conversations with her"; that

Ms. Berk had never talked to her about the Gordon home; that there had never been any exchange of work, payment, or gifts between her and Ms. Berk; that she did not "know anything about [Ms. Berk's] involvement with Kim Williams before the hearing"; and that it was her practice to seek legal advice about whether she should recuse herself from a hearing if she were to have a discussion with a designation applicant.

We do not agree with the Gordons' assertion that "renewed offers of free use of the Berk vacation home" served as a "pecuniary motive" for Ms. Pfaehler to vote in favor of historic designation. As noted, there was only one offer and even if a pecuniary interest could be inferred from that, we believe it "too remote and insubstantial to violate the constitutional constraints applicable to" fair adjudicative procedure. *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 243 (1980). *See also Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 n.3 (1986) ("[D]isqualification is not worked in cases where the [pecuniary] interest is so remote, trifling and insignificant that it may fairly be supposed to be incapable of affecting the judgment of or of influencing the conduct of an individual.") (internal quotation marks omitted).

Nor can we construe, from Ms. Pfaehler's presentation of a lifetime achievement award to Ms. Berk on behalf of the HPRB, "bias or prejudice" that is "personal in nature" and "sufficient to raise a question in the mind of the average citizen about" her impartiality. *Mayers v. Mayers*, 908 A.2d 1182, 1190-91 (D.C.

2006) (quoting *Anderson v. United States*, 754 A.2d 920, 925 (D.C. 2000)). There is nothing in the record to indicate that Ms. Pfaehler had any part in selecting Ms. Berk for the award, or any involvement beyond representing the Board at the ceremony in her capacity as Chair. Accordingly, we fail to discern Ms. Pfaehler's bias or the appearance thereof in favor of Ms. Berk.

The bulk of the Gordons' lack-of-neutral-decision-maker argument focuses on Ms. Berk's reliance on Ms. Williams—vis à vis a staff report recommending historic designation of the Gordon home—to secure a Board vote in favor of designating the Gordon home a historic landmark. But Ms. Williams was not a decision-maker. Therefore, in the absence of any evidence that her staff report posed a risk to Ms. Pfaehler and the HPRB of actual or apparent bias, Ms. Williams's own bias is insufficient to overcome the presumption of decision-makers' honesty. *See Withrow*, 421 U.S. at 55 (explaining that board members "are assumed to be [people] of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances"). Accordingly, the Superior Court did not err in dismissing the Gordons' claim that they were deprived of a neutral decision-maker.

### III.    Conclusion

For the foregoing reasons, the judgments of the trial court are reversed in part and affirmed in part, and the case is remanded for proceedings consistent with this opinion.

*So ordered*.